**Lawrence H. LEVNER,**
**Plaintiff–Appellant,**

v.

**PRINCE ALWALEED Bin Talal Bin**
**Abdulaziz Al Saud, and Citicorp,**
**Defendants–Appellees.**

**No. 1534, Docket 94–9134.**

United States Court of Appeals,
Second Circuit.

Argued June 21, 1995.

Decided July 26, 1995.

John F. Harnes, New York City (Joan T. Harnes, Silverman, Harnes & Harnes, Levy, Sonet & Siegel, New York City, on the brief), for plaintiff-appellant.

Joseph M. Hassett, Washington, DC (David G. Leitch, Albert W. Turnbull, Hogan & Hartson, on the brief), for defendant-appellee Prince Alwaleed Bin Talal Bin Abdulaziz Al Saud.

Joseph T. McLaughlin, New York City (Margaret A. Helen Macfarlane, Shearman & Sterling, on the brief), for defendant-appellee Citicorp.

Before: NEWMAN, Chief Judge, WALKER, and CALABRESI, Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal by Lawrence H. Levner, a shareholder of appellee Citicorp, presents issues relating to the adequacy of demand in a shareholder derivative suit and the propriety of a grant of summary judgment against appellant on his claim for violations of section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1988). The District Court for the Southern District of New York (Loretta A. Preska, Judge) held, with respect to the first issue, that appellant's demand on the board of directors of Citicorp did not meet the requirements of Fed.R.Civ.P. 23.1. As an alternative basis for its holding, the Court stated that appellant had failed to plead with particularity that the board's refusal of his demand was wrongful. On the section 16(b) issue, the Court held that summary judgment was appropriate because appellee Prince Alwaleed Bin Talal Bin Abdulaziz Al Saud ("Alwaleed") was not the beneficial owner of more than 10 percent of Citi-

corp common stock when he engaged in an alleged short-swing purchase and sale and for that reason did not violate section 16(b). In reaching this conclusion, the Court found it "dispositive as a matter of law that [Alwaleed's preferred] stock was not 'presently convertible'" at the time of the alleged short-swing transaction. Judgment was entered November 3, 1994.

We affirm as to both issues on the carefully reasoned opinion of Judge Preska. *See* —— F.Supp. ——, 1994 WL 570748 (S.D.N.Y.1994). In so holding, we reject appellant's arguments as to the section 16(b) claim that the District Court incorrectly found that the 5,900 shares of Citicorp non-voting convertible preferred stock that Alwaleed held at the time of the alleged short-swing transaction were not "presently convertible." The District Court based its holding, among other things, on paragraph 8 of the February 21, 1991, purchase agreement entered into between Alwaleed and Citicorp at the time he acquired the preferred shares (the "Purchase Agreement"). In the "Standstill Provision" of the Purchase Agreement, Alwaleed covenanted that he would not acquire beneficial ownership of more than 10 percent of Citicorp common stock during a certain standstill period—essentially five years. *See* Purchase Agreement ¶ 8(a)(i). The Board of Governors of the Federal Reserve Board ("FRB") explicitly relied on this covenant in determining that Alwaleed's acquisition of preferred stock, which, if fully converted, would have rendered him the owner of more than 10 percent of Citicorp's common stock,[1] did not require either the FRB's approval or the prior filing of a Notice of Change in Bank Control, *see* 12 U.S.C. § 1817(j) (1994); 12 C.F.R. § 225.41. *See* Letter from Jennifer J. Johnson, Associate Secretary of the FRB, to Richard J. M.

Poulson, Esq. and Neal L. Petersen, Esq., Hogan & Hartson (Feb. 21, 1991).

Appellant contends, however, that another section of the Purchase Agreement, paragraph 19, gave Alwaleed the right to convert his preferred shares before the end of the standstill period. Paragraph 19 provided that Alwaleed would not convert his preferred stock before the earliest of (1) March 1, 1992, (2) a date 75 days after delivery to Citicorp of notice stating that the aggregate number of existing common shares and of common shares upon conversion held by Alwaleed was less than 10 percent, or (3) the date on which Alwaleed or his affiliates requested regulatory approval from the Board, but no earlier than October 1, 1991. *See* Purchase Agreement ¶ 19(c). Alwaleed requested regulatory approval on January 7, 1992. Thus, Levner argues, he had the right to convert his shares on that date—the date he *requested* approval—prior to the occurrence of the alleged short-swing purchase and sale. Appellees argue, and the District Court held, that Alwaleed was legally prevented from converting his preferred stock during the sale and purchase period, because the FRB had not yet approved his request, as required by 12 U.S.C. § 1817(j) and 12 C.F.R. § 225.41(a) ("Regulation Y").[2]

Appellees and the District Court are correct. While paragraph 19 may, in an appropriate case, have permitted Alwaleed to convert some of his preferred shares at the time he requested FRB approval, it did not—indeed, it could not—have allowed him to convert his preferred shares in sufficient *quantity*, together with the common shares he already held, to render him the beneficial owner of more than 10 percent of Citicorp common stock. That conversion, as the Court found, would have required regulatory approval. *See* 12 U.S.C. § 1817(j); Regula-

---

1. Prior to his acquisition of the preferred shares, Alwaleed owned 4.8 percent of Citicorp's common stock. The 5,900 shares of preferred stock he purchased on or about February 21, 1991, were convertible into 9.99 percent of Citicorp's outstanding common shares. Thus, Alwaleed's previously owned common, together with the fully converted preferred shares, would be equal, in the aggregate, to 14.8 percent of Citicorp's stock.

2. Although Regulation Y is styled as a "prior notice requirement," it is in fact a request for approval of the proposed transaction. Approval of the notice is presumed sixty days after filing, unless the Board disapproves it or extends the time for disapproval. *See* 12 C.F.R. § 225.43(c).

tion Y, 12 C.F.R. § 225.41(a);[3] *cf. Citadel Holding Corp. v. Roven*, 26 F.3d 960, 967 (9th Cir.1994) (stock options not "presently exercisable" where exercise required federal bank board approval or sale of sufficient stock to avoid 10 percent ceiling for federal reporting requirements).

Levner also argues that the Standstill Provision did not limit Alwaleed's right to convert his preferred stock. That Provision specified that Alwaleed would not:

> (i) [i]n any way acquire, offer or propose to acquire or agree to acquire Beneficial Ownership of any Voting Securities or any direct or indirect rights or options to acquire Beneficial Ownership of any Voting Securities if, after such acquisition, the aggregate percentage of Total Voting Power with respect to Voting Securities Beneficially Owned by the Purchaser would exceed 10% (or 15% if all required governmental approvals are obtained with respect to the acquisition of more than 10% of the aggregate percentage of Total Voting Power by the Purchaser).

*See* Purchase Agreement ¶ 8(a). Levner points out that the Purchase Agreement elsewhere defines Voting Securities to include the depository shares (representing preferred shares) purchased by Alwaleed. *See* Purchase Agreement ¶ 15(*l*). Thus, he contends, the Standstill Provision did not prevent Alwaleed from converting his preferred stock into common, but rather, it prevented him from acquiring those shares in the first instance. Seeking to reconcile his view of the Purchase Agreement with the transaction that actually transpired, Levner then argues that the Purchase Agreement contemplated that Alwaleed could acquire and convert his stock in accordance with paragraph 19 above, subject only to divestiture of any amount of common stock over 10 percent if regulatory approval were denied.

Levner's argument rests on the premise that by signing the Purchase Agreement, Alwaleed undertook to do what he expressly agreed not to do under the Standstill Provision. We decline to read the Standstill Provision as prohibiting on its face the very purchase of the preferred shares. Instead, we read the verb "acquire" in paragraph 8(a)(1), as appellees contend, to refer broadly to the conversion of the preferred shares into voting securities. Appellant's reading would render the Standstill Provision a nullity—a position we cannot accept. *See Penguin 3rd Avenue Food Corp. v. Brook–Rock Associates*, 174 A.D.2d 714, 571 N.Y.S.2d 562, 564 (2d Dept.1991) ("[A] court should not adopt [a contract] interpretation which would leave any provision without force and effect.").

The judgment of the District Court is affirmed.

---

**3.** Levner further contends that the District Court misconstrued Regulation Y. Regulation Y states that

> [a]ny person acting directly or indirectly, or through or in concert with one or more persons, shall give the Board 60 days' written notice, ... before acquiring control of a state member bank or bank holding company....

12 C.F.R. § 225.41(a). Appellant's view of Regulation Y is that it requires notice for the acquisition of common stock or of preferred shares convertible thereinto, but not for the conversion of preferred shares to common. Appellant cites no authority for his reading of Regulation Y, which refers to the acquisition of "control," or "voting securities," *id.* § 225.41(c).