**MEDTOX SCIENTIFIC, INC., f/k/a Editek, Inc., Plaintiff,**

v.

**MORGAN CAPITAL L.L.C., Alex Bistricer, and David Bistricer, Defendants.**

No. Civ. 97–253 ADM/AJB.

United States District Court, D. Minnesota.

June 3, 1999.

Frank A. Taylor, and Gregory J. Schaefer, Hinshaw & Culbertson, Minneapolis, MN, for plaintiff.

Jonathan M. Hoff, Cadwalader, Wickersham & Taft, New York, NY, and Catherine A. McEnroe, Leonard, Street and Deinard, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

Plaintiff Medtox Scientific, Inc. ("Medtox"), f/k/a Editek, Inc. ("Editek"),[1] filed this action on January 31, 1997, to recover alleged short-swing insider profits realized by Defendant Morgan Capital L.L.C. ("Morgan Capital") and its alleged control persons, Defendants Alex and David Bistricer ("Bistricers"), on a series of 1996 transactions involving Editek stock. On August 4, 1997, Judge Richard H. Kyle of this Court dismissed Plaintiff's Complaint for failure to state a claim upon which relief can be granted. *See Editek v. Morgan Capital, L.L.C.*, 974 F.Supp. 1229 (D.Minn.1997) (*"Editek I "*). Plaintiff appealed the decision, and on July 24, 1998, the Eighth Circuit Court of Appeals reversed the district court judgment and remanded the case for further proceedings. *See Editek v. Morgan Capital, L.L.C.*, 150 F.3d 830 (8th Cir.1998) (*"Editek II "*). Judge Kyle subsequently recused himself from the case pursuant to 28 U.S.C. § 455,

---

**1.** After this action was commenced, Editek changed its name to Medtox. For purposes of clarity and consistency with prior opinions issued in this case by both the district and appellate courts, references to Plaintiff in this decision will be to Editek.

and it was reassigned to the undersigned United States District Judge. The matter is currently before the Court on Defendants' Motion to Dismiss the Complaint and Plaintiff's Motion for Partial Summary Judgment. For the reasons set forth below, Defendants' motion is denied and Plaintiff's motion is granted.

## II. DEFENDANTS' 12(b)(6) MOTION

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"). In considering a motion to dismiss, the pleadings are construed in a light most favorable to the plaintiff, and the facts alleged in the complaint must be taken as true. *See Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir.1994); *Ossman v. Diana Corp.*, 825 F.Supp. 870, 879–80 (D.Minn.1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. *See Ossman*, 825 F.Supp. at 880. A complaint should be dismissed pursuant to Rule 12(b)(6) "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995) (citations omitted). In other words, "[a] motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671.

### A. The Complaint

On or about February 1, 1996, Editek, a Delaware corporation with its principal place of business in Minnesota, issued shares of Convertible Preferred Stock ("Preferred Stock") in an offering conducted under Section D of the Securities Act of 1933 ("the Offering"). Compl. ¶¶ 2, 11. At the option of the holder, each share of Preferred Stock was convertible to Editek common stock ("Common Stock") at a price equal to the average closing price of the shares of Common Stock for the five trading day period preceding the date notice of conversion was given to Editek by such holder. *Id.* ¶ 12. Consequently, the number of shares of Common Stock that the Preferred Stock would buy floated with the average trading price of the Common Stock. As the trading price of the Common Stock declined, the number of shares of Common Stock that the Preferred Stock would buy increased, and vice-versa. The right to convert the Preferred Stock was not exercisable until 60 days after issuance of the shares. *Id.*

Morgan Capital, a limited liability corporation with offices in Brooklyn, New York, purchased Preferred Stock from Editek in the Offering. Compl. ¶¶ 3, 13. At the time of its purchase, the number of shares of Common Stock that Morgan Capital would have received upon conversion of its Preferred Stock (were it allowed to immediately convert the stock) would have been less than ten percent of the outstanding shares of Editek's Common Stock. *Id.* ¶ 13.

On March 28, 1996, as a result of a decline in the price of the Common Stock, the amount of shares of Common Stock that Morgan Capital would have received upon conversion of its Preferred Stock (again, were it allowed to convert the stock at such time) would have been greater than ten percent of the outstanding shares of Editek's Common Stock. Compl. ¶ 14. March 30, 1996, marked the first day upon which Morgan Capital was eligible to convert its Preferred Stock into Common Stock. *See Editek II*, 150 F.3d at 832.

On May 1, 1996, Morgan Capital converted all of its Preferred Stock into Common Stock. Compl. ¶ 15. The Common Stock that Morgan Capital received in the conversion amounted to greater than ten percent of the outstanding shares of Editek's Common Stock. *Id.* Morgan Capital then sold a portion of its shares of Common Stock on five separate occasions in May and June 1996, realizing a profit of at least $500,000. *Id.* ¶¶ 17, 18.

## B. Section 16(b)

In its sole claim for relief, Editek alleges that Morgan Capital's conduct violated Section 16(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78p(b). Section 16(b) was enacted to prevent corporate "insiders" from abusing their fiduciary positions "by using confidential corporate information to aid their personal market activities." *Petteys v. Butler,* 367 F.2d 528, 532 (8th Cir.1966), *cert. denied* 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967). The statute provides in relevant part as follows:

For the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months....

15 U.S.C. § 78p(b). The term "beneficial owner" is defined in Section 16(a) as "[e]very person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* " of the Act. 15 U.S.C. § 78p(a). The so-called "ten percent beneficial owners" are considered insiders, and therefore included within the statute's reach, because "the size of their holdings afford[s] the potential for access to corporate information." *Foremost–McKesson, Inc. v. Provident Secs. Co.,* 423 U.S. 232, 253, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).

Determining who qualifies as a ten percent beneficial owner under Section 16(b) is no simple task. Rule 16a–1 of the governing regulations states the following:

Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the [1934] Act, the term "beneficial owner" shall mean any person deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder ...

17 C.F.R. § 240.16a–1(a)(1). Under Section 13(d), a beneficial owner of a security includes any person who has voting power or investment power in relation to the security. *Id.* § 240.13d–3(a). Furthermore, "[a] person shall be deemed to be the beneficial owner of a security if that person has the right to acquire beneficial ownership of such security, as defined in Rule 13d–3(a) (§ 240.13d–3(a)) within sixty days ... [t]hrough the conversion of a security." *Id.* § 240.13d–3(d)(1)(i)(B) (" 'within sixty days' rule"). In other words, persons who have the right to acquire voting power or investment power in relation to a security within sixty days are deemed "beneficial owners" of that security for purposes of determining ten percent beneficial ownership.

Finally, "[t]o be liable under Section 16(b), a ten percent beneficial owner must have been such 'both at the time of the purchase and sale, or the sale and purchase, of the security involved.' " *Editek II,* 150 F.3d at 831 (quoting 15 U.S.C. § 78p(b)). Since owners below the ten percent threshold "presumptively lack[ ] access to inside information, the acquisition that takes a buyer above ten percent beneficial ownership does not count as a 'purchase' matchable against a later sale for Section 16(b) purposes." *Id.*

## C. Prior Orders

Judge Kyle based his decision to dismiss Plaintiff's Section 16(b) claim on two separate grounds. First, he held that the

"within sixty days" rule barred Plaintiff's claim because the Complaint did not allege that Morgan Capital had the ability to convert its Preferred Stock to more than ten percent of Common Stock on the sixtieth day after the Preferred Stock was issued (the first day that conversion was permissible under the terms of the Preferred Stock). *See Editek I*, 947 F.Supp. at 1233. Without such an allegation, Judge Kyle reasoned that Plaintiff could not show Morgan Capital was a beneficial owner of Editek Common Stock prior to the May 1, 1996, conversion because Morgan Capital did not have the right to acquire ten percent of the outstanding shares of such stock within sixty days of acquiring the Preferred Stock. *Id.; see also Editek II*, 150 F.3d at 833.

As an alternative basis for dismissal, Judge Kyle examined the floating exercise price at which the Preferred Stock was convertible to Common Stock in light of the following passage from a 1991 SEC Release:

> [A] right with a floating exercise price is not required to be reported and will not be deemed to be acquired or purchased, for Section 16 purposes, until the purchase price of the underlying securities becomes fixed or established, which commonly occurs at exercise. Thus, a right to purchase an equity security is deemed acquired as of the date the exercise or conversion price becomes fixed.

*Editek I*, 974 F.Supp. at 1233. Because the conversion price of the Common Stock could not be determined or fixed until the

date Morgan Capital gave notice to Editek of its desire to convert, Judge Kyle reasoned that the "right [to acquire] referred to in the ownership provision [the "within sixty days" rule] could not be attributed to Morgan Capital until the day it actually converted its Preferred Stock to Common Stock: May 1, 1996." *Id.* Given that fact, Judge Kyle concluded that Morgan Capital was not a ten percent beneficial owner of Editek Common Stock prior to May 1, 1996, and, therefore, the conversion could not constitute a purchase matchable against Morgan Capital's later sales for purposes of Section 16(b). *See id.* at 1233–34; *Editek II* 150 F.3d at 833–34.

On appeal, the Eighth Circuit reversed the dismissal and remanded the case. Initially, the court rejected Judge Kyle's interpretation of the "within sixty days" rule and held that the "rule makes Morgan Capital a *beneficial owner* of Editek common stock on every day within sixty days of every day on which Morgan Capital had the right to acquire Editek common stock through conversion—including March 28." *Editek II*, 150 F.3d at 833 (emphasis added).[2] The court declined to rule, however, on whether Morgan Capital was a *"ten percent* beneficial owner" prior to converting its Preferred Stock to Common Stock on May 1, 1996: "Of course, whether a beneficial owner under the 'within sixty days' rule is also a ten percent owner, and thus an insider subject to § 16(b), is a separate matter." *Id.*

Addressing the second ground for dismissal, the appellate court explained that

**2.** Noting that the "within sixty days" rule was enacted under Section 13(d)—a provision which compels persons who acquire beneficial ownership of more than five percent of any class of an issuer's equity securities to report their acquisition to the issuer and the SEC—the court offered the following hypothetical fact pattern as an illustration of why the rule must be read with a forward-looking, rather than a backward-looking, purpose in mind:

> Suppose Morgan Capital's nonvoting preferred stock had been convertible beginning ninety days after issuance. Suppose further

that on the first possible conversion date, the preferred stock would be worth more than five percent of Editek's voting common stock. Three days before that date, Morgan Capital sells its preferred stock to a buyer. Under the district courts's reading of the "within sixty days" rule, the buyer would have no duty to report its purchase to Editek, the stock exchange, or the SEC, even though the buyer would have a right exercisable in three days to acquire a potentially control-influencing stake in Editek's voting securities.

*Editek II*, 150 F.3d at 833.

there is more than one definition of the term "beneficial owner," and that the SEC passage quoted by Judge Kyle does not apply in this case:

> The SEC is simply talking about something other than determining ten percent beneficial ownership. Again, for those other purposes, the term beneficial owner means a person who has a direct or indirect pecuniary interest in registered equity securities. *See* 17 C.F.R. § 240.16a–1(a)(2). With that in mind, and taking into consideration the quoted passage's context, the SEC's meaning becomes apparent.
>
> The passage is lifted from a lengthy discussion of derivative securities. *See* [1990–1991 Transfer Binder] Fed.Sec. L.Rep. ¶ 84,709, at 81,258–81,266. A convertible security is a type of derivative. *See* 17 C.F.R. § 240.16a–1(c). To own a derivative security is to have an indirect pecuniary interest in the underlying security. *See id.* § 240.16a–1(a)(2)(ii)(F). But here is the crucial exception: a derivative with a floating exercise or conversion price is not a derivative security for § 16 purposes. *See id.* § 240.16a–1(c)(6); [1990–1991 Transfer Binder] Fed.Sec.L.Rep. ¶ 84,709, at 81,265. In other words, Morgan Capital, as a holder of floating-price convertible preferred stock, did not own derivative securities, did not have an indirect pecuniary interest in the underlying common stock, and accordingly (assuming Morgan Capital had no other form of pecuniary interest) was not a beneficial owner of the common stock until the conversion—for purposes other than determining ten percent beneficial ownership. It may seem odd that Morgan Capital both was and was not a beneficial owner of Editek common before the conversion, but the SEC has long recognized the two definitions of beneficial owner can result in different determinations of beneficial ownership. *See* Interpretive Release on Rules Applicable to Insider Reporting and Trading, Release No. 34–18,114, 4 Fed.Sec.L.Rep. (CCH) ¶ 26,062, at 19,063–7 n. 17 (Sept.

23, 1981). In sum, the quoted passage has no bearing on whether Morgan Capital was a beneficial owner for the purpose of determining ten percent beneficial ownership before the conversion. That issue is governed by the "within sixty days" rule, not the "pecuniary interest" rule.

*Editek II,* 150 F.3d at 834.

Finally, the Eighth Circuit identified two additional arguments raised by Defendants on appeal and addressed them in the following manner:

> Morgan Capital claims a holder of convertible preferred stock cannot "float" into and out of ten percent ownership of the underlying common stock as the price of the common stock fluctuates. The district court mentioned this issue, but did not resolve it. *See Editek,* 974 F.Supp. at 1233. At oral argument, Morgan Capital argued its stock conversion was not a "purchase" matchable against a later sale, but merely a change in the form of its beneficial ownership. In remanding this case, we express no opinion on these or any other issues, which we leave for the district court to address in the first instance as the parties choose to raise them.

*Editek II,* 150 F.3d at 834–35. Defendants now advance these two arguments, as well as a third, in support of their second motion to dismiss.

## D. Ten Percent Beneficial Ownership

### 1. "Right to Acquire"

The Eighth Circuit's conclusion that Morgan Capital was a "beneficial owner" of Editek Common Stock before it actually converted the Preferred Stock into Common Stock on May 1, 1996, does not definitively resolve whether Plaintiff has stated a valid claim for relief under Section 16(b). As explained above in part II.B., "beneficial ownership" of any class of an issuer's equity securities does not *per se* render a shareholder subject to Section 16(b); only those shareholders who directly or beneficially own more than ten per-

cent of any class of an issuer's equity securities are subject to the statute's restrictions. Therefore, the question squarely before the Court at this juncture is whether, consistent with the allegations in the Complaint, Plaintiff could conceivably prove that Morgan Capital beneficially owned more than ten percent of Editek Common Stock when it converted its Preferred Stock into Common Stock on May 1, 1996.

Plaintiff alleges that Morgan Capital became a "ten percent beneficial owner" of Editek Common Stock at least as early as March 28, 1996, when, had conversion been allowed, Morgan Capital's Preferred Stock could have been converted into more than ten percent of the outstanding shares of Editek's Common Stock. In their Motion to Dismiss, Defendants initially argue that Morgan Capital could not have been a "ten percent beneficial owner" prior to converting its Preferred Stock on May 1, 1996, because the percentage of Common Stock that Morgan Capital would eventually be able to acquire in exchange for its Preferred Stock was incalculable until the date of conversion. As noted above, the Preferred Stock was convertible at a price equal to the average closing price of the Common Stock for the five trading days preceding the date notice of conversion was given to Editek. Thus, Defendants contend that Morgan Capital did not have a legally enforceable, contractual "right to acquire" any particular percentage of Editek Common Stock (as that phrase is used in the "within sixty days" rule) prior to May 1, 1996.

In advancing their interpretation of the phrase "right to acquire," Defendants rely upon three cases: *Levner v. Prince Alwaleed*, 61 F.3d 8 (2nd Cir.1995); *Allen v. Westpoint–Pepperell, Inc.*, Nos. 90 Civ. 3841, 89 Civ.2016, 1996 WL 2004 (S.D.N.Y. Jan.3, 1996); and *Transcon Lines v. A.G. Becker Inc.*, 470 F.Supp. 356 (S.D.N.Y. 1979). These cases all stand for the proposition that an investor can not be considered a "beneficial owner" of an equity security when the investor's right to acquire the security is contingent upon a future

event. *See Levner*, 61 F.3d at 9 (defendant not a beneficial owner of common stock at the time of alleged short-swing transaction because preferred stock was not presently convertible); *Allen*, 1996 WL 2004, at *6 (aggressor in a hostile takeover bid did not have a "right to acquire" the tendered stock of certain shareholders within the meaning of Rule 13d–3 where the aggressor's acquisition was contingent upon the shareholders not withdrawing their tendered stock by a particular date); and *Transcon Lines*, 470 F.Supp. at 371 (defendant not a beneficial owner of plaintiff's stock under Rule 13d–3 because his right to acquire the stock was contingent upon a future event). In *Editek II*, however, the Eighth Circuit implicitly rejected this argument by holding that Morgan Capital was a beneficial owner of Editek's Common Stock sixty days prior to March 30, 1996, despite the fact that Morgan Capital did not have a contractual right to acquire any Common Stock until that date. *Id.*, 150 F.3d at 832.

Even assuming that the decision in *Editek II* does not undermine their argument on this point, Defendants' interpretation of the phrase "right to acquire" does not entirely preclude Plaintiff from stating a valid claim under Section 16(b). Due to the retrospective nature of the conversion formula for the Preferred Stock, Defendants accurately point out that assigning Morgan Capital a precise percentage of beneficial ownership in Editek Common Stock on any day prior to March 30, 1996 (the first date upon which the Preferred Shares were convertible), is difficult. Until Morgan Capital's conversion rights had ripened, the percentage of Common Stock for which Morgan Capital would eventually be able to exchange its Preferred Stock was contingent upon future events beyond Morgan Capital's control (e.g., the closing price of the Common Stock on the five trading days preceding March 30, 1996). Thus, although Morgan Capital was a "beneficial owner" of Editek Common Stock prior to March 30, 1996, it could not definitively be considered a "ten percent

beneficial owner"—and thus an insider for purposes of Section 16(b)—during that time.

■ However, from March 30, 1996, onward, Morgan Capital did have a contractual right to convert its Preferred Stock to Common Stock at any time. Furthermore, the percentage of Common Stock for which Morgan Capital could exchange its Preferred Stock was no longer contingent upon future, but rather past, events. Its conversion rights having ripened, Morgan Capital could readily determine the percentage of outstanding shares of Common Stock it would receive in exchange for its Preferred Stock on any given day by simply calculating the average closing price of the Common Stock for the five previous trading days. Thus, if the trailing five-day average closing price declined sufficiently at any time between March 30, 1996, and May 1, 1996, such that Morgan Capital would have been able to acquire ten percent of the outstanding shares of Editek Common Stock on a given day, then Morgan Capital would have to be considered a "ten percent beneficial owner" of Editek's Common Stock under Section 16(b)—at least on that particular day. Although Plaintiff does not specifically allege in the Complaint that Morgan Capital had the right to acquire more than ten percent of Editek's Common Stock on any date between March 30, 1996, and May 1, 1996, proof of that fact would be consistent with the allegations set forth in the Complaint; therefore, dismissal of Plaintiff's claim on the grounds that Morgan Capital could not have been a "ten percent beneficial owner" prior to May 1, 1996, would be inappropriate. *See Goss v. City of Little Rock*, 90 F.3d 306, 308 (8th Cir.1996) (explaining that "dismissal should not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle relief").

## 2. Floating In and Out

■ Aside from relying by analogy upon the SEC's rule that excludes floating-price convertible securities from Section 16's definition of derivative securities (a tactic the Eighth Circuit rejected in *Editek II* ), Defendants cite no authority to support their argument that holders of convertible preferred stock with a floating exercise price can not float in and out of "ten percent beneficial ownership." After March 30, 1996, if Morgan Capital could have converted its Preferred Stock into more than ten percent of the outstanding shares of Editek's Common Stock on any given day, then the presumption arises under Section 16(b) that Morgan Capital's holdings afforded it the potential for access to corporate information not available to a smaller shareholder on that day. *See Foremost–McKesson*, 423 U.S. at 253–54, 96 S.Ct. 508. At the same time, however, due to the floating conversion rate of the Preferred Stock, Morgan Capital's standing as a "ten percent beneficial owner" was potentially subject to change daily. Thus, to establish liability under Section 16(b), Plaintiff will not simply have to show that Morgan Capital could have obtained more than ten percent of Editek's Common Stock on any given day prior to May 1, 1996, but that Morgan Capital could have obtained more than ten percent of Editek's Common Stock on the day before it actually made the illicit purchase—April 30, 1996. Otherwise, Morgan Capital presumably would not have had access to inside information when it actually purchased Editek Common Stock and, therefore, would not be subject to the strictures of Section 16(b).

The fact that Morgan Capital's holdings may have hovered around Section 16's magical ten percent level does not justify Defendants' proposed blanket rule excluding all holders of floating-price convertible securities from the "ten percent beneficial owner" category. For example, if during the relevant time period leading up to conversion, Morgan Capital's shares of Preferred Stock could have been converted into a range of twenty-three to twenty-seven percent of Editek's Common Stock, rather than eight to twelve percent, then there would be little doubt that Morgan Capital should be considered an "insider"

prior to the date of actual conversion in spite of the floating nature of its convertible securities. The clarity demonstrated by this example arises from the fact that Morgan Capital would at all times have had the option of acquiring possession of a substantial portion of Editek's Common Stock. In passing the Exchange Act, Congress set the "insider" bar at an arbitrary ten percent. To avoid the presumption of insider trading, Section 16 requires holders of floating-price convertible securities to be mindful of the percentage of Common Stock that they could obtain in exchange for their Preferred Stock when dealing in an issuer's securities. Although occasionally onerous (particularly when an investor's holdings hover near the ten percent mark), such monitoring is a necessary obligation to avoid being squashed by Section 16's "crude rule of thumb." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593 n. 23, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

### E. Purchase and Sale

■ Defendants' final argument for dismissal pursuant to Rule 12(b)(6) is that Plaintiff has failed to allege Morgan Capital engaged in a matchable purchase and sale of Editek's Common Stock after becoming a "ten percent beneficial owner" of such stock. Defendants claim that, even assuming Morgan Capital was a "ten percent beneficial owner" of Editek's Common Stock prior to May 1, 1996, its conversion did not constitute a purchase of Common Stock, but rather a change in the form of Morgan Capital's beneficial ownership of the Common Stock from indirect to direct. The term "purchase" is broadly defined in the Exchange Act to include "any contract to buy, purchase or otherwise acquire." 15 U.S.C. § 78c(a)(13). Plaintiffs respond that Morgan Capital's conversion falls within the statute's "otherwise acquire" language.

In support of their argument, Defendants rely exclusively upon the following passage from the same discussion of derivative securities in the 1991 SEC Release cited earlier:

The rules correspondingly recognize that, for purposes of the abuse addressed by Section 16, the exercise of a derivative security, much like the conversion of a convertible security, essentially changes the form of beneficial ownership from indirect to direct. Since the exercise represents neither the acquisition nor the disposition of a right affording the opportunity to profit, it should not be an event that is matched against another transaction in the equity securities for purposes of Section 16(b) short-swing profit recovery.

1991 WL 292000, at *12. Significantly, Defendants omit from their citation the subsequent paragraph in the Release which elaborates upon the rationale for the above statement:

The profit that can be realized on short-swing transactions, whether accomplished through derivative securities, the underlying equity security or a combination of both, depends upon the price of the underlying security. While the amount of the profit may vary given factors such as the time value of money and volatility of the underlying stock evidenced in the option premium, the exercise does not change the opportunity to realize a profit. As the price of the underlying common stock increases, so does the value of a call option or similar derivative security *with a fixed exercise or conversion* related to the common stock.

*Id.* (emphasis added). As this second portion of the passage reveals, a conversion does not constitute a "purchase" and does not present an opportunity to realize a profit only if the conversion or exercise price is fixed.

On the other hand, when the conversion price is not fixed—as is the case here—an opportunity to realize a profit presents itself where the holder of the preferred stock has access to inside information. Armed with confidential knowledge of positive developments on the horizon, the insider could convert his preferred stock

when the price of the common stock is low, then sell the common stock a couple weeks or months later, after its price has risen, at a significant profit. Consequently, the SEC considers the conversion of a derivative with a floating exercise price to be a purchase matchable against sales within six months for purposes of Section 16:

> The rules adopted today clarify that a right with a floating exercise price is not required to be reported and will not be deemed to be acquired or purchased, for Section 16 purposes, until the purchase price of the underlying securities becomes fixed or established, which commonly occurs at exercise. Thus, *a right to purchase an equity security is deemed acquired as of the date the exercise or conversion price becomes fixed, and the acquisition, absent an exemption, would be matchable for Section 16(b) purposes with a disposition within six months of the fixing of the price.* For example, the acquisition of an option having an exercise price equal to 90 percent of the market price as of the date of exercise would be deemed to be a purchase of the underlying stock as of the date of exercise.

*Id.* (emphasis added). Thus, Plaintiff's allegation that Morgan Capital engaged in a matchable purchase for purposes of Section 16(b) liability by converting its floating-price Preferred Stock into Editek Common Stock on May 1, 1996, is sufficient to withstand Defendants' motion to dismiss.

Eighth Circuit case law also supports such a conclusion. In *Petteys v. Butler,* 367 F.2d at 535, the court explained that when determining whether a particular transaction should be considered a "purchase" under the Exchange Act, "each case must be examined on its own particular facts." The court went on to set forth the following test for use in the individualized analysis:

> If, from an examination of the particular facts, a transaction is of a kind that can possibly lend itself to the speculation encompassed by § 16(b) and falls within the broad definition of "purchase" and

"sale", it will be so defined. However, if an examination of the facts indicates that there is no possibility of abuse, there is no need to apply a § 16(b) label to the transaction.

*Id.* Thus, if Morgan Capital's conversion of Preferred Stock into Editek's Common Stock could possibly have lent itself to speculation, then the conversion must be considered a "purchase" under the Exchange Act.

As explained above, the possibility of speculative abuse in Morgan Capital's conversion was high. Beginning March 30, 1996, Morgan Capital had control over when to convert its Preferred Stock into Common Stock and, assuming it could have converted its Preferred Stock into more than ten percent of the outstanding shares of Common Stock prior to May 1, 1996, Morgan Capital presumably was in possession of inside information at the time it chose to convert its stock. Therefore, consistent with the Act, the 1991 SEC Release, and Eighth Circuit precedent, Morgan Capital's alleged conversion of its Preferred Stock into Editek's Common Stock on May 1, 1996, constituted a "purchase" of the Common Stock under Section 16(b).

## III. DEFENDANTS' 12(b)(3) MOTION

■ Rule 12 also provides that a defendant may move to dismiss a complaint for improper venue. Fed.R.Civ.P. 12(b)(3). Venue for Section 16(b) claims is governed by Section 27 of the Exchange Act. Section 27 provides in relevant part:

> Any suit or action to enforce any liability or duty created by this chapter or the rules and regulations thereunder ... may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business...

15 U.S.C. § 78aa. The term "transacts business" has been liberally interpreted to constitute any transaction of business within the district. *See, e.g., Abbey v.*

*Henzel,* 731 F.Supp. 1431, 1435 (E.D.Mo. 1990) (telephoning, sending mail, and faxing documents to plaintiff in forum state sufficient to establish venue); *Wilson v. Lamb,* 632 F.Supp. 1442, 1446–47 (W.D.Ark.1986) (mailing important documents to forum to be executed by plaintiffs is sufficient to establish venue). "Venue is proper as to all defendants if one act in furtherance of the alleged unlawful scheme is done in the forum district." *Stewart v. Fry,* 575 F.Supp. 753, 755 (E.D.Mo.1983). *See also Bourassa v. Desrochers,* 938 F.2d 1056, 1057 (9th Cir.1991) (telephone call by defendant to plaintiff in forum sufficient to establish venue); and *Steinberg & Lyman v. Takacs,* 690 F.Supp. 263, 267 (S.D.N.Y. 1988) (any not-trivial act in forum district which helps to accomplish securities law violation, including phone call made by defendant to forum, is sufficient to establish venue).

■ Defendants Alex and David Bistricer initiated numerous telephone calls to Plaintiff's Vice President of Finance/Chief Financial Officer, Peter J. Heath ("Heath"), during April and May 1996. Heath Aff. ¶¶ 3, 4. On the basis of these phone calls, Morgan Capital allegedly decided to purchase and sell Editek Common Stock in May and June 1996 in violation of Section 16(b). Assuming the allegations to be true, Defendants transacted sufficient business within Minnesota to establish venue here for Plaintiff's claim. Accordingly, Defendants' Rule 12(b)(3) motion is denied.

## IV.  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.  Factual Background[3]

■ Editek and Morgan Capital entered into a Private Securities Subscription Agreement ("Agreement") on January 30, 1996, pursuant to which Morgan Capital purchased three shares of nonvoting Editek Preferred Stock for $150,000. Block

Aff. Ex. 1. The Preferred Stock was convertible into Editek Common Stock beginning on March 30, 1996. *Id.* The number of shares of Common Stock into which the Preferred Stock could be converted was a function of the average closing bid price of Editek Common Stock for the five trading day period preceding the date Morgan Capital gave notice of conversion to Editek. *Id.* In other words, as the trading price of Editek's Common Stock declined, the number of shares of Common Stock into which Morgan Capital's Preferred Stock could be converted concomitantly increased.

The price of Editek's Common Stock steadily declined throughout March and April 1996. Heath Aff. Ex. B. As a result, on any day between April 9 and April 30, 1996, the price was sufficiently low that had Morgan Capital elected to convert its Preferred Stock, it would have received more than ten percent of the outstanding shares of Editek's Common Stock. *Id.* at ¶ 10, Ex. E. During this time interval, Defendants David and Alex Bistricer, officers and controlling principals of Morgan Capital's day-to-day business affairs, had weekly telephone conversations with Editek management. *Id.* at ¶ 3. Approximately one-half of these calls were placed by Alex Bistricer to Editek's Minnesota office. *Id.* The topics discussed included Editek's declining stock price and its implications for Morgan Capital's conversion rights. *Id.* at ¶ 4. Editek also responded to a range of questions from the Bistricers regarding the company's underlying business. *Id.*

On May 1, 1996, Morgan Capital converted its Preferred Stock into 4,584,795 shares of Common Stock. Braun Aff. ¶ 4. At the time of conversion, the shares received represented more than ten percent of the outstanding shares of Editek Common Stock. *Id.* at ¶ 4, Ex. C. Following the conversion, the Bistricers' weekly tele-

---

**3.** Because Plaintiff is moving for summary judgment, the facts are set forth in a light most favorable to Defendants.

phone conversations with Editek continued throughout May 1996. Heath Aff. ¶¶ 3, 4. In several trades during May and June 1996, Morgan Capital sold 688,272 shares of Editek Common Stock for a total of $919,269.39. Braun Aff. ¶¶ 2, 3, Exs. A, B. Morgan Capital's basis in the shares it sold was $367,812.55.[4] As a result of these transactions, Morgan Capital realized total profits of $551,456.84.[5]

## B. Section 16(b) Violation

Plaintiff seeks entry of summary judgment against Morgan Capital in the amount of $551,456.84. In response, Defendants simply reiterate the arguments raised in their motion to dismiss: 1) that Morgan Capital was not a "ten percent beneficial owner" of Editek's Common Stock until conversion of the Preferred Stock on May 1, 1996; and 2) even if Morgan Capital was a "ten percent beneficial owner" of Editek's Common Stock prior to May 1, 1996, conversion of its Preferred Stock into Common Stock did not constitute a "purchase" under Section 16(b). As explained above, these arguments are precluded by the Eighth Circuit's decision in Editek II, as well as the applicable statutory and case law.

Morgan Capital became a "ten percent beneficial owner" of Editek Common Stock on April 9, 1996, and remained such through at least June 30, 1996.[6] By exercising the option to convert its Preferred Stock into Common Stock on May 1, 1996, Morgan Capital fixed the conversion price and thereby engaged in a matchable purchase of Editek's Common Stock for Section 16(b) liability purposes. Over the next two months, Morgan Capital sold a portion of the stock it purchased on May 1,

1996, for a total profit of $551,456.84. Because these transactions constitute "short-swing" insider trading in violation of Section 16(b), Editek is entitled to recover the full profit realized by Morgan Capital. See *Park & Tilford v. Schulte*, 160 F.2d 984, 987 (2nd Cir.1947), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947) (holding that the purpose of the Exchange Act is "to squeeze all possible profits out of [insider] stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty"). Plaintiff's motion is therefore granted.

## V. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss [Docket No. 34] is **DENIED.**

2. Plaintiff's Motion for Partial Summary Judgment [Docket No. 39] is **GRANTED.**

3. Defendant Morgan Capital shall pay damages to Plaintiff in the amount of $551,456.84.

---

**4.** The effective conversion price was $.5344 per share. *See* Braun Aff. ¶ 6. Therefore, at a price of $.5344 per share, Morgan Capital's basis in the 688,272 shares of Editek Common Stock it sold during May and June 1996 was $367,812.55.

**5.** Morgan Capital owned more than ten percent of Editek's Common Stock on every day between May 1, 1996, and June 30, 1996. *See* Braun Aff. ¶ 7. Morgan Capital filed a Sched-

ule 13D with the SEC on May 17, 1996, on which it declared that it owned 18.2 percent of the outstanding Common Stock as of May 9, 1996. *Id.* at Ex. C. Morgan Capital filed an Amended Schedule 13D on July 9, 1996, on which it declared that it owned 15.44 percent of the outstanding Common Stock as of July 3, 1996. *Id.* at Ex. D.

**6.** *See supra* note 5.