**CIBC WORLD MARKETS, INC., Plaintiff,**

v.

**DEUTSCHE BANK SECURITIES, INC., Deutsche Bank Securities Limited, Wayne Breedon, R.B.F. International, Inc., Kenneth D'Angelo, Richard Evangelista, Genesisintermedia.Com, Ultimate Holdings, Ltd., Ramy El–Batrawi, and Bradford Keiller, Defendants.**

No. 2:03–CV–05374 (DRD).

United States District Court, D. New Jersey.

March 11, 2004.

---

**638**

See, also, 282 F.Supp.2d 1032.

Harold G. Levison, Esq., Joseph A. Gershman, Esq., Kasowitz, Benson, Torres & Friedman LLP, New York City, for Plaintiff.

Sheryl M. Schwartz, Esq., Herold and Haines PA, Warren, NJ, James H.R. Windels, Esq., Davis Polk & Wardwell, New York City, for Defendants Deutsche Bank Securities, Inc., and Deutsche Bank Securities Limited.

Melanie H. Muhlstock, Esq., Glenn S. Kerner, Esq., Goodwin Procter LLP, Roseland, NJ, Jeffrey A. Simes, Esq., Eric D. Musselman, Esq., Richards M. Strassberg, Esq., Goodwin Procter LLP, New York City, for Defendant Wayne Breedon.

Michael Q. Carey, Esq., Carey & Associates LLC, New York City, for Defendant Richard Evangelista.

## OPINION

DEBEVOISE, Senior District Judge.

Plaintiff CIBC World Markets, Inc. ("CIBC"), a Canadian securities broker-dealer, has filed suit seeking compensation[1] for losses it suffered allegedly as a result of its unwitting participation in a fraudulent stock loan and market manipulation scheme orchestrated by Defendants. Four of the Defendants—Deutsche Bank Securities, Inc. ("Deutsche Bank Securities"), Deutsche Bank Securities Limited ("DBSL"),[2] Richard Evangelista ("Evangelista") and Wayne Breedon ("Breedon") (collectively, "the Moving Defendants")— have moved to transfer the case to the U.S. District Court for the District of Minnesota ("Minnesota court"), where several similar cases brought by other securities broker-dealers allegedly defrauded by the same scheme are pending. Because the instant case might have been brought in the Minnesota court and because that court would be a more convenient forum for its litigation, the court will grant the Moving Defendants' motion.

## BACKGROUND [3]

### I. The Scheme

CIBC alleges that Defendants perpetrated a multi-million dollar fraudulent scheme ("the scheme") involving stock of the struggling marketing company GenesisIntermedia.com, Inc. ("Genesis"). The scheme was comprised of two major components: (1) fraudulent manipulation (by various methods) of Genesis stock to artificially inflate its value, and (2) use of the artificially inflated stock as collateral to obtain loans from various securities broker-dealers, including CIBC. After the market dropped the week of September 11, 2001, Defendants were no longer able to keep the price of the stock inflated, or to repay the loans to the broker-dealers. The scheme collapsed, leaving numerous broker-dealers holding worthless stock and causing those broker-dealers and the investing public to lose hundreds of millions of dollars.

One of the Defendants—Kenneth D'Angelo ("D'Angelo")—has already been charged with and pled guilty to two felonies (securities fraud and wire fraud) arising out of his participation in the scheme. Furthermore, the SEC has filed a civil action arising out of the scheme against D'Angelo and his company, securities lending "finder" RBF International, Inc. ("RBF"). Both of these actions were filed in the U.S. District Court for the Central District of California in September, 2003.

\* \* \* \* \* \*

Stock lending is a common practice in the securities industry whereby a party loans securities to a broker-dealer in exchange for cash collateral to cover short positions or for other legitimate purposes.[4]

---

1. CIBC also seeks treble damages under New Jersey's RICO statute, punitive damages, and attorneys' and investigators' fees.

2. Both Deutsche Bank Securities and DBSL are subsidiaries of Deutsche Bank AG, one of the largest financial services companies in the world.

3. The facts in this section are narrated as alleged in CIBC's Complaint and in the criminal information recently filed by the SEC against Defendant D'Angelo in the U.S. District Court for the Central District of California.

4. According to Plaintiffs, there are two other legitimate purposes for stock loans. First, a

The parties mark the cash collateral to market, so that, as the price for a particular stock rises and falls, cash is delivered to or returned from the lender.

In 1999, Defendant Ramy El–Batrawi ("El–Batrawi"), who controlled Genesis, approached D'Angelo and proposed that he structure a scheme by which both could exploit the practice of stock-lending for profit. The proposed scheme would revolve around El–Batrawi and Ultimate (a company controlled by El–Batrawi that was a major Genesis shareholder) loaning overvalued Genesis stock down several "chains" of broker-dealers in exchange for cash collateral.[5]

D'Angelo agreed to structure the scheme and employed the assistance of his friends and former business associates Evangelista (the head of securities lending at New Jersey broker-dealer Native Nations) and Breedon (a DBSL employee). D'Angelo, Breedon and Evangelista over time created a series of stock loan "chains" that at their height extended in this way: El–Batrawi and Ultimate lent Genesis stock to Native Nations, which in turn lent the stock to numerous broker-dealers including CIBC[6] ("the intermediate broker-dealers") which in turn lent it to DBSL. In exchange for the Genesis stock, DBSL posted cash collateral with the intermediate broker-dealers, which in turn posted the cash with Native Nations, which posted it finally with the original lender, El–Batrawi.[7] El–Batrawi divided some of the cash among the Defendants and used the rest to manipulate the price of Genesis stock to artificially inflate its value.

El–Batrawi and some of the other Defendants achieved the artificial inflation of Genesis's stock price by, among other methods: (1) secretly compensating a financial commentator to falsely "tout" Genesis stock on widely televised financial programs in order to hype demand for the stock; (2) engaging in manipulative trading of Genesis stock in numerous brokerage accounts in order to boost the trading volume of the stock and support its price; (3) "parking" substantial amounts of Genesis stock in order to limit the supply of the stock available for purchase in the open market; and (4) promoting a "short

---

borrowing broker-dealer may borrow securities when it needs them for a particular transaction and expected to receive them from another source that failed to deliver the securities. Second, if the lender is also a broker-dealer, the borrowing broker-dealer may borrow the securities to "on-lend" them to still another broker-dealer. This facilitates "conduit" transactions whereby securities are borrowed and re-lent from one firm to another in a series of transactions or "loan chains" before the borrowed stock arrives at its final destination, the "end user." A borrower in these transactions can make money through borrowing and on-lending by negotiating to pay a smaller "rebate" to its downstream borrower than it receives from its upstream lender. All broker-dealer securities lending activity must be conducted in accordance with Regulation T of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 220 et seq. and Rule 15c3–3 issued by the SEC.

5. The proposed scheme overcame the difficulty of a typical market manipulation scheme where, while it may be possible to drive up the price of thinly-traded stocks through phony bids, "wash sales" and other devices, it is difficult to sell any substantial quantity of the stock at the artificially high price without depressing that price.

6. After being solicited by D'Angelo in October 2000, CIBC borrowed 90,000 shares of Genesis from Native Nations (in exchange for $1,350,000 in cash collateral) and immediately re-lent them to DBSL. On November 7, 2000, CIBC borrowed another 110,000 shares of Genesis from Native Nations (in exchange for $1,870,000 cash collateral) and again lent them to DBSL.

7. To conceal the fraud from its auditors Native Nations falsified its books.

squeeze" to additionally reduce the amount of Genesis stock available and force investors who were "shorting" Genesis stock to make purchases of the stock at inflated prices.

As the price of Genesis stock went up, DBSL, the intermediate broker-dealers, and Native Nations all marked to market, thus sending more cash up the loan chain, ultimately to El–Batrawi. When the stock price dropped in September 2001, CIBC and other intermediate broker-dealers took back the stocks they had loaned DBSL and gave back to DBSL the cash collateral it had taken at the time of the loan. Native Nations, however, was unable to return the cash collateral it had taken from CIBC and the other broker-dealers. As a result, the broker-dealers were left holding virtually worthless securities.

CIBC has filed an eleven count Complaint against Defendants seeking damages for Defendants' acts within this broad scheme that directly caused it harm. The Complaint contains two claims under the Securities Exchange Act of 1934 ("the Se-

curities Exchange Act"), four claims under New Jersey securities and racketeering statutes, and common law claims of fraud and fraudulent concealment, aiding and abetting fraud and fraudulent concealment, civil conspiracy, negligent misrepresentation, and breach of contract.

None of the individual parties to this lawsuit reside in Minnesota and none of the corporate parties are incorporated in Minnesota or registered to do business there.[8] None of the loans CIBC took from Native Nations or gave to DBSL in 2000 were effected in Minnesota.

## II. The Minnesota Actions

In September 2002, two intermediate broker-dealers (FBW and E*Trade) and the trustee in bankruptcy of another intermediate broker-dealer (MJK) (collectively, "Minnesota Plaintiffs") initiated lawsuits ("Minnesota actions" or "Minnesota Complaints") in the Minnesota court[9] based on injuries they suffered as a result of the scheme described above.[10] The Minnesota Plaintiffs, like CIBC, had occupied positions between Native Nations and DBSL

---

8. CIBC is a Canadian broker-dealer with its principal place of business in Toronto. DBSL, too, is a Canadian broker-dealer with offices in various locations in Canada. Deutsche Bank Securities maintains its principal place of business in New York City, and has offices throughout the world.

RBF is a New Jersey corporation with offices formerly in Edison, New Jersey. D'Angelo, its President and Secretary, resides in Edison, New Jersey. Native Nations is a New Jersey broker-dealer with its principal place of business in Jersey City, New Jersey. Its former senior vice president, Evangelista, resides in New Jersey.

Genesis was a Delaware corporation with its registered address in Van Nuys, California. Ultimate is a Bermuda investment company. Defendant Keiller, who was a major Genesis shareholder, is a resident of Nevada.

9. Specifically, (1) the trustee in bankruptcy for MJK Clearing, Inc. ("MJK") commenced

an adversarial proceeding in the U.S. Bankruptcy Court for the District of Minnesota on September 12, 2002; the case was later transferred to the Minnesota court; (2) Ferris, Baker Watts, Inc. ("FBW") brought suit in the Minnesota court on September 20, 2002, and (3) E*Trade Securities LLC ("E*Trade") brought suit in the Minnesota court on September 25, 2002. There is also a securities class action on behalf of Genesis shareholders based on the scheme pending in the Minnesota court.

10. According to the parties, in addition to these Minnesota actions and the previously mentioned lawsuits the SEC filed in the Central District of California, the scheme has also spawned two arbitrations in New York City conducted under the auspices of the New York Stock Exchange, and cases in the Eastern District of Pennsylvania, the Southern District of New York and the Bankruptcy Court in this district.

in the "loan chains" Defendants structured.[11] The Minnesota Plaintiffs named as defendants in the Minnesota actions largely the same defendants CIBC has named in the instant case,[12] and brought claims against them similar to the claims CIBC has brought against Defendants in the instant case.[13] Venue was proper for these cases in the District of Minnesota because MJK is a Minnesota corporation and the loans in question in the Minnesota actions all either were made to MJK or flowed through MJK.

CIBC's Complaint is related to MJK's complaint not only because CIBC occupied a position roughly analogous to MJK's on loan chains Defendants created, but also because CIBC was alerted to the fact that it had been the victim of Defendants' fraudulent scheme by the unsealing of MJK's Complaint. Without seeing that Complaint, CIBC would have had "no reason to know that anything other than the garden-variety failure of a lower tier bro-

ker-dealer ... in the market turmoil following September 11" had caused its losses. Complaint ¶¶ 11–12.

Furthermore, the factual allegations in CIBC's Complaint are explicitly based on, among other things, the allegations in the Minnesota Complaints. As the Moving Defendants point out, certain allegations in CIBC's Complaint are copied almost word-for-word from allegations in the Minnesota Complaints. Moving Brief, n. 2.

In late 2002, the defendants named in the Minnesota actions filed motions to dismiss the Minnesota Complaints. On September 8, 2003, after a day-long hearing, Judge Kyle of the Minnesota court issued a 79–page ruling dismissing some of the claims, but holding that others survived.

On September 10, 2003, another intermediate broker-dealer who allegedly was harmed by the scheme, Wedbush Morgan Securities, Inc. ("Wedbush"), filed suit in the Minnesota court.[14]

---

11. MJK was brought into the scheme in November 2000—the month after CIBC became involved. FBW and E*Trade were brought into the chain much later—June and September 2001, respectively—and, unlike CIBC, actually served as extra links in the chain between MJK and DBSL. For this reason, the Minnesota Court referred to MJK as a "hub" for the scheme. *Stephenson v. Deutsche Bank AG*, 282 F.Supp.2d 1032, 1047 (D.Minn. 2003).

12. MJK's Complaint names as defendants Deutsche Bank AG, Deutsche Bank Securities, DBSL, Breedon, RBF, D'Angelo, Evangelista, Genesis, El–Batrawi, Ultimate, and Keillor, as well as Adnan Khashoggi ("Khashoggi"), the Saudi arms dealer, to whom El–Batrawi allegedly transferred his interest in Ultimate in November 2000. FBW's Complaint names all those MJK names except Keillor and Genesis, plus (1) broker-dealer A.G. Edwards & Son, Inc., (2) broker-dealer Nomura Canada, Inc. (and its stock loan manager as well as the corporation that supervised and managed its business activities), and (3) the President of Native Nations.

E*Trade's Complaint names as defendants all those FBW names, plus Genesis and Keillor.

13. MJK, FBW and E*Trade each brought some or all of the following claims: charges under the Securities Act of 1933 and the Securities Exchange Act of 1934, the federal Racketeering Influenced and Corrupt Organization Act, the Minnesota Securities Act and the Minnesota Consumer Protection Act, and common law claims for fraud, conspiracy to defraud, and negligent misrepresentation.

14. Wedbush's Complaint named as defendants Deutsche Bank AG, DBSL, Deutsche Bank Securities, Breedon, D'Angelo, Evangelista, RBF, Ultimate, Khashoggi, El–Batrawi, Genesis, plus a company (Holiday RV Superstores, Inc.) whose shares (like those of Genesis) were exchanged in the scheme, and its CEO. Wedbush's Complaint includes claims for violation of the Securities Act of 1933, the Securities Exchange Act of 1934, and the federal Racketeering Influenced and Corrupt Organization Act, and claims of common law fraud, common law conspiracy, and unjust enrichment.

On October 24, 2003, Magistrate Judge Boylan of the District of Minnesota issued a detailed order consolidating the Minnesota actions for pretrial purposes and establishing procedures, limits, and a schedule for discovery.

The Moving Defendants have asked this court to transfer CIBC's case to the Minnesota court pursuant to 28 U.S.C. § 1404(a).

## DISCUSSION

### I. § 1404(a) Motions to Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. 1404(a). "The purpose of Section 1404(a) is to avoid the waste of time, energy and money and, in addition, to safeguard litigants, witnesses and the public against avoidable inconvenience and expense." *Lawrence v. Xerox Corporation,* 56 F.Supp.2d 442, 449 (D.N.J.1999).

■ The burden of establishing the need for transfer rests with the movant. *Jumara v. State Farm Insurance Compa-*

*ny,* 55 F.3d 873, 879 (3d Cir.1995). Specifically, the movant's burden is to show that (1) the case "might have been brought" in the district to which he asks the court to transfer it, and (2) the proposed transferee court would be a more convenient forum for the litigation.

■ A court must itself have subject matter jurisdiction over an action before it may transfer that action under § 1404(a). 17–111 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 111.14 (3d ed.1997). This requirement is clearly fulfilled here: the court may exercise original jurisdiction over the federal claims in CIBC's Complaint pursuant to 28 U.S.C. § 1331 [15] and 15 U.S.C. § 78aa,[16] and supplemental jurisdiction over the state law claims in the Complaint pursuant to 28 U.S.C. § 1367(a).[17]

Plaintiff contends that this case cannot be transferred to the District of Minnesota because it could not have been brought there originally.

### II. Might the case have been brought in the District of Minnesota?

CIBC could have brought its case in the Minnesota court because that court could

---

**15.** 28 U.S.C. § 1331 provides

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**16.** 15 U.S.C. § 78aa provides, in relevant part,

The district courts of the United States ... shall have exclusive jurisdiction of violations of this chapter ... and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.

*See also Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 381, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) ("the statute plainly mandates that suits alleging violations of the Exchange Act may be maintained only in federal court").

**17.** 28 U.S.C. § 1367(a) provides, in relevant part

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

The court need not affirm that it has personal jurisdiction over the parties for the purposes of deciding this motion to transfer. *Gehling v. St. George's School of Medicine, Ltd.,* 773 F.2d 539, 544 (3d Cir.1985); *U.S. v. Berkowitz,* 328 F.2d 358, 361 (3d Cir.1964).

have exercised subject matter jurisdiction over CIBC's claims and personal jurisdiction over the parties, and because venue would have been proper there.

## A. Subject Matter Jurisdiction & Personal Jurisdiction

 The Minnesota court could have exercised subject matter jurisdiction over the federal and state claims in CIBC's Complaint for the same reasons this court can.

The Minnesota court also properly could have exercised personal jurisdiction over Defendants. The Securities Exchange Act authorizes nationwide service of process. 15 U.S.C. § 78aa;[18] *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir.2002); *Ocepek v. Corporate Transport, Inc.*, 950 F.2d 556, 557 n. 1 (8th Cir.1991). The Eighth Circuit has adopted the national contacts test for personal jurisdiction in cases brought under such statutes, *In re* *Federal Fountain, Inc.*, 165 F.3d 600 (8th Cir.1999), and CIBC certainly has alleged that each of the Defendants has substantial contacts with the United States as a whole. Complaint ¶¶ 15–26. *See Washington Square Securities Inc. v. Walden*, No. Civ. 02–4795, 2004 WL 45505, at *3 (D.Minn. Jan. 6, 2004) (" § 78aa confers personal jurisdiction on any United States District Court over any defendant with minimum contacts with the United States, as opposed to minimum contacts with a particular state").[19]

## B. Venue

 CIBC argues that the Minnesota court would not have been a proper venue for this litigation under 28 U.S.C. § 1391(b) ("the general venue statute").[20] The venue provision of primary importance in cases brought under the Securities Exchange Act, however, is not 28 U.S.C. § 1391(b), but rather 15 U.S.C. § 78aa.[21] Under this provision, venue is

---

18. § 78aa provides, in relevant part

> process in [any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations] may be served in any ... district of which the defendant is an inhabitant or wherever the defendant may be found.

19. The Moving Defendants argued for the first time in their Reply Brief that the Minnesota court could have exercised personal jurisdiction over Defendants. CIBC argues that the Moving Defendants were barred from asserting that argument in their Reply Brief because they did not assert it in their Moving Brief. The Moving Defendants should have noted that the 1934 Securities Act authorizes nationwide service of process in their Moving Brief. That proposition is so clear and well-established, however, that the court would have noted it on its own even if neither party had pointed in any of the briefs to the portion of § 78aa cited in the previous footnote. The court will thus not find the Moving Defendants' omission to address personal jurisdiction in its Moving Brief fatal to its motion.

20. 28 U.S.C. 1391(b) provides

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

CIBC argues that "a substantial part of the events or omissions giving rise to" its claims did not occur in Minnesota. *See* Opposition Brief at 24 ("the claims occurred in New Jersey, Toronto, New York, California, Texas, Nevada and Bermuda—but not in Minnesota.").

21. 15 U.S.C. § 78aa provides, in relevant part

> Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any [district wherein any act or transaction constituting the violation occurred] or in the district

proper in (1) a district of which the defendant is an inhabitant, (2) a district in which the defendant is found, (3) a district in which the defendant transacts business, or (4) a district wherein any act or transaction constituting the alleged violation of the Securities Exchange Act occurred.

Nothing submitted in connection with this motion leads the court to believe that any of the Defendants inhabit the District of Minnesota. The Moving Defendants argue that venue would have been proper in that district because Defendants are "found" there—or alternately because some of them "transact business" there— but for the reasons explained below the court does not accept these arguments. The District of Minnesota would nevertheless have been a proper venue for CIBC's case, however, because at least one act or transaction constituting the violation of the Securities Exchange Act CIBC alleges occurred there.

\*　　\*　　\*　　\*　　\*　　\*

The Moving Defendants claim venue would have been proper in the District of Minnesota because Defendants are "found" in that district. Courts have interpreted the "is found" language of § 78aa in various ways. Some have held that a defen-

dant is "found" in a district when it does the things there that courts have traditionally associated with "doing business" for jurisdictional purposes. In *Kansas City Power & Light Co. v. Kansas Gas and Electric Company*, for example, the court held that "[t]he word 'found' as used in the statute means 'a presence and continuous local activity within the district.'" 747 F.Supp. 567, 572 (W.D.Mo.1990) (citation omitted). Other courts have held that a party is "found" for the purposes of § 78aa anywhere he is subject to service of process. *See, e.g., Dales v. Gruntal & Co.*, No. CV–83–4310, 1984 WL 2390 (C.D.Cal. Jan. 31, 1984); *United Industrial Corporation v. Nuclear Corporation of America*, 237 F.Supp. 971, 976 (D.Del.1964). No information in the record indicates that all of the Defendants are "found" in Minnesota according to either of these interpretations.

Defendants argue that they are found in the District of Minnesota because they have consented to be sued there, and thus that venue would have been proper in that district. The court does not accept this argument for three reasons. First, all of the Defendants have *not* consented to be sued in the District of Minnesota by CIBC

---

wherein the defendant is found or is an inhabitant or transacts business

The Moving Defendants argued in their Moving Brief that venue would have been proper in the District of Minnesota pursuant to § 1391(b), and did not cite § 78aa as a basis for venue until their Reply Brief. Plaintiff argues that in so doing the Moving Defendants illicitly raised an argument in their Reply Brief that did not appear in their Moving Brief, and that the court should consequently omit to take that argument into consideration in resolving this case.

"It is axiomatic that Reply Briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted. The rationale for this rule is self-evident because the local rules do not permit sur-Reply Briefs, see L.Civ.R.

7.1(d), a party opposing [a motion] has no opportunity to respond to newly minted arguments contained in Reply Briefs." *Bayer AG v. Schein Pharmaceutical, Inc.*, 129 F.Supp.2d 705, 716 (D.N.J.2001) (internal quotations and citations omitted).

In citing a new statute in a Reply Brief to support a position clearly taken in the Moving Brief, however, the Moving Defendants did not make a "newly minted argument," but rather merely "explain[ed] a position in the initial brief that the respondent ha[d] refuted." Furthermore, because oral argument was heard on this motion, Plaintiff had sufficient opportunity to respond to the Moving Defendants' explanation using § 78aa of its argument that venue would have been proper in Minnesota.

over the violations described in CIBC's Complaint (only four of them have so consented by moving to transfer this case).[22] Second, the case Defendants cite in support of their argument, *Freeman v. Bee Mach Co.*, 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943), involves a factual scenario that differs from the instant scenario in numerous significant ways and which, anyway, interprets the "is found" language of the Clayton Act—not the Securities Exchange Act. Finally, the Supreme Court has held that § 1404 transfer is proper only if the plaintiff, *independent of the defendants' wishes*, might have brought the case originally in the proposed transferee court, *Hoffman v. Blaski*, 363 U.S. 335, 342–44, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960); there must have been another basis for venue in Minnesota for transfer to be proper.

The Moving Defendants also argue that the District of Minnesota would have been a proper venue for CIBC's suit because, as CIBC itself acknowledges in its Complaint (¶¶ 66–68), several of the Defendants "transacted business" there in the context of Minnesota broker-dealer MJK's involvement in the broad scheme CIBC describes in its Complaint. The Minnesota court has interpreted the phrase "transacts business" in § 78aa liberally "to constitute any transaction of business within the district," *Medtox Scientific, Inc. v. Morgan Capital L.L.C.*, 50 F.Supp.2d 896, 905–06 (D.Minn. 1999). The fact that some of the Defendants transacted business in Minnesota as noted in ¶¶ 66–68 thus might make venue proper as to those Defendants. It does not, however, provide a basis for venue as to the other Defendants who the Complaint gives no indication transacted business in the District of Minnesota (e.g., Keiller).[23]

Though Defendants do not inhabit, are not found in, and do not transact business in the District of Minnesota, that district nevertheless would have been a proper venue for CIBC's lawsuit because at least one act or transaction constituting the violation of the Securities Exchange Act CIBC alleges occurred there. Under § 78aa, venue is proper in a district "wherein any act or transaction constituting the violation occurred." Courts have interpreted this to mean that a *single act* performed in a forum in furtherance of the illegal event that harmed the plaintiff and is alleged in the Complaint may form the basis for venue in that forum, so long as the act was material. *See, e.g., Bath Industries, Inc. v. Blot*, 427 F.2d 97, 114 (7th Cir.1970) ("all that is required is but one act within the forum district which represents more than an immaterial part of the allegedly illegal events"). *See also, e.g., RMS Titanic, Inc. v. Geller*, No. 3:99CV2401, 2000 WL 306997 at *3 (D.Conn. Jan. 10, 2000); *Basil v. Leidesdorf*, 713 F.Supp. 1194, 1196 (N.D.Ill.1989); *Carty v. Health–Chem Corporation*, 567 F.Supp. 1, 2 (E.D.Pa.1982); *Arpet v. Homans*, 390 F.Supp. 908, 912 (W.D.Pa.1975).

**22.** The fact that the Defendants have consented to be sued in the District of Minnesota by other parties in other related or unrelated lawsuits is, of course, irrelevant.

**23.** The co-conspirator theory of venue (*see* footnote 24 and accompanying text), under which in certain cases venue is proper as to all defendants if it is proper as to one of them, only applies if "one act or transaction constituting the violation" of the Securities Exchange Act occurred in the district. The transaction involving MJK referenced in ¶¶ 66–68 of the Complaint is not such an act because, for reasons explained below, the court takes a narrow view of the "violation" alleged in CIBC's Complaint (i.e., viewing the violation as the series of events that led directly to CIBC's specific injury and for which CIBC seeks damages rather than the broader fraudulent scheme Defendants allegedly perpetrated against numerous broker-dealers including MJK).

The District of Minnesota has adopted the "co-conspirator theory of venue," which dictates that in multi-defendant securities cases in which a conspiracy is alleged, venue is proper in the forum for *all* defendants so long as one defendant performed in the forum a single material act in furtherance of the alleged violation of the Securities Exchange Act.[24] *Medtox Scientific, Inc.*, 50 F.Supp.2d at 906. If just one of the Defendants, then, performed a single material act in the District of Minnesota in furtherance of the violation alleged in CIBC's Complaint, venue is proper in that district for all Defendants.

Plaintiff in effect argues that no act in furtherance of the violation about which it complains occurred in Minnesota. Opposition Brief at 22 ("none of the defendants committed any of the conduct being complained about while in Minnesota"). It alleges that the stock loans CIBC took and gave (and which led to its injury) were effected in Toronto. CIBC acknowledges that another broker-dealer (MJK) took and gave similar loans in Minnesota that allegedly caused it similar injury, but argues that those specific stock loans did not injure CIBC and thus did not contribute to the violation over which it sues.[25] CIBC takes a narrow view of "the violation," then, characterizing it as the set of events that directly caused *it* harm.

The Moving Defendants urge the court to view "the violation" as the broad scheme by which Defendants allegedly defrauded *all* of the intermediate broker-dealers. They point out that CIBC describes the larger scheme that victimized other broker-dealers besides itself in its Complaint and will likely try to prove the existence of that scheme at trial to give context for the injuries it individually suffered. Under that broad scheme, they point out, the intermediate broker-dealers—including Plaintiff and MJK—were both used as conduits for stock loan transactions. While, unlike MJK, CIBC may not have suffered injury directly *because of* Defendants' loans to MJK in Minnesota, it allegedly suffered *the same kind* of injury as MJK did in Minnesota due to *the same kind of* acts on the part of Defendants, as part of a single over-arching scheme. *See* Reply Brief at 6 ("plaintiff's claims are premised on the exact same theory of loss that underlies the Minnesota cases"). For this reason, the Moving Defendants maintain, CIBC's case is sufficiently connected to Minnesota for venue to be proper there.[26]

The court need not use as the basis for venue for CIBC's case in Minnesota the mere fact that CIBC's counterpart (MJK) was injured in Minnesota in the same way as CIBC was injured elsewhere. To do that, the court would essentially need to hold that "the violation" in § 78aa's phrase "act or transaction constituting the violation" can include conduct that did not directly harm the plaintiff, and for which the plaintiff does not seek damages. The court need not adopt this holding (and endorse its potentially wide-ranging implications) in order to find that the District of Minnesota would have been a proper venue for litigation of CIBC's claims under

---

24. *See also* 15 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3824 (2d ed.1986); *Securities Investor Protection Corp. v. Vigman,* 764 F.2d 1309, 1317 (9th Cir.1985); *Hilgeman v. National Insurance Company of America,* 547 F.2d 298, 302 (5th Cir.1977).

25. It does appear from the materials submitted that MJK and CIBC occupied similar posi-

tions in structurally similar but ultimately distinct loan chains.

26. Defendants argue that their alleged conduct in Minnesota would fulfill not only the "act or transaction constituting the [alleged] violation" requirement of § 78aa, but even the more difficult "substantial part of the events or omissions giving rise to the claim" venue requirement of 28 U.S.C. § 1391(b).

the Securities Exchange Act. It can arrive at that conclusion instead by identifying in the materials submitted by CIBC at least one act Defendants performed in Minnesota that materially contributed to the violation that *directly* injured CIBC and for which it seeks damages.

In the criminal information filed in the Central District of California charging D'Angelo with securities and wire fraud, the government lists several overt acts D'Angelo committed and caused others to commit in furtherance of the conspiracy. This list includes the following:

> On or about April 25, 2001, [El–Batrawi] authored a letter published in the Wall Street Journal urging [Genesis] shareholders to take actions to prevent short selling their [Genesis] stock.

As mentioned above, one of the ways in which Defendants allegedly manipulated the price of Genesis stock in violation of the Securities Exchange Act was by promoting a "short squeeze." The publication of the letter was a material act in furtherance of that alleged violation that (unlike the stock loans to MJK) directly harmed CIBC (as well as the other broker-dealers allegedly harmed by the broader scheme). Complaint ¶ 90. Because the Wall Street

Journal has a national circulation, there is no doubt that El–Batrawi's letter was published, among other places, in Minnesota. For this reason, venue would have been proper in Minnesota.[27]

The caselaw overwhelmingly supports the proposition that the publication of misleading information in a judicial district—if it is a material part of the claimed violation—is a proper basis for venue in that district. *See, e.g., Mitchell v. Texas Gulf Sulphur Company,* 446 F.2d 90, 106 (10th Cir.1971) *and Texas Gulf Sulphur v. Ritter,* 371 F.2d 145, 148–49 (10th Cir.1967) (venue proper in Utah under § 78aa because defendants, *inter alia,* released a "false and fraudulent" press release to the news media which (1) came to Salt Lake City on the Dow–Jones broad tape and (2) was printed in the Wall Street Journal which was transmitted through the U.S. mails to Utah); *In re AES Corporation Securities Litigation,* 240 F.Supp.2d 557 (E.D.Va. 2003) (venue would be proper in Indiana—so case could be transferred there—under § 78aa because defendant released press releases containing misleading statements over the business wire which reached a national audience includ-

---

**27.** Several other acts some or all of the Defendants performed to manipulate the price of Genesis stock might also have occurred in Minnesota and thus be able to serve as a basis for venue there. For example, Plaintiff notes in ¶ 40 of its Complaint that

> El–Batrawi ... recruited conspirators in the financial press to assist his efforts to increase Genesis stock price. In order to increase demand for Genesis stock, El–Batrawi arranged to secretly pay Courtney Smith ("Smith"), a well-known financial commentator, in exchange for his touting Genesis to the investing public. Beginning in or about December 1999 and continuing to in or about March 2001, Smith recommended Genesis stock to the investing public at least 18 times while appearing as a guest on various financial television pro-

grams, thereby increasing or sustaining the Genesis stock at artificially inflated prices. Additionally, the SEC notes in ¶ 26 of the criminal information it filed against D'Angelo that El–Batrawi and others "[s]ecretly compensat[ed] and caus[ed] an ex-stockbroker to issue a report, entitled "The Genie in Genesis Potentially a Major Blow for the Shorts," that was faxed and e-mailed to numerous brokers and investors throughout the United States." If any of the financial television programs on which Smith touted the stock enjoyed a national viewership (including Minnesotans), and if any of the brokers and investors "throughout the United States" to whom the "Genie in Genesis" report was faxed and e-mailed were in Minnesota, these acts, too, would serve as bases for venue in the District of Minnesota.

ing Hoosiers); *In re Triton Limited Securities Litigation,* 70 F.Supp.2d 678, 686–87 (E.D.Tex.1999) (venue proper in the Eastern District of Texas under § 78aa because defendant sent allegedly misleading press releases into the district); *Eades v. Boston Technology,* No. Civ. A. 95–7236, 1996 WL 668403, at *3 (E.D.Pa. Nov. 13, 1996) (venue proper in the Eastern District of Pennsylvania under § 78aa because defendant transmitted press releases containing allegedly false information into the district); *S–G Securities, Inc. v. Fuqua Investment Company,* 466 F.Supp. 1114, 1121 (D.Mass.1979) (venue proper in Massachusetts under § 78aa because the substance of defendant's press releases was reported in the Wall Street Journal and the Dow Jones broad tape and was thereby transmitted into the district); *Oxford First Corporation v. PNC Liquidating Corporation,* 372 F.Supp. 191, 197 (E.D.Pa.1974) (Becker, J.) (venue proper in Eastern District of Pennsylvania under § 78aa because defendants knew or had reason to know that the allegedly false information they let be sent into the district would be read and relied upon by potential plaintiffs; "[v]enue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district ... the nature and function of a press release is to diffuse information"). The publication of a letter in the Wall Street Journal urging shareholders to behave in a certain way so that the price of Genesis stock would rise is similar to the publication of misleading information in order to inflate the price of stock that occurred in the cases cited above.

Because at least one act that materially contributed to the violation that *directly* injured CIBC and for which CIBC seeks damages occurred in the District of Minnesota, venue would have been proper for CIBC's claims under the Securities Exchange Act had it originally filed suit there.[28] Because the District of Minnesota would have been the proper venue for resolution of CIBC's claims under the Securities Exchange Act, it would also be proper for the pendent state claims in the Complaint. *Travis v. Anthes Imperial Limited,* 473 F.2d 515, 529 (8th Cir.1973) (when venue is proper on federal claims, it is also proper on pendent state claims).

Because the Minnesota court could have exercised subject matter jurisdiction over CIBC's claims and personal jurisdiction over the parties to the lawsuit, and because venue would have been properly laid in Minnesota, CIBC's case "might have been brought" in the Minnesota court.

### III. Would the District of Minnesota be a more convenient forum for the litigation?

Having found that CIBC's case might have been brought in the District of Minnesota, the court must now determine whether that district would be a more convenient forum for litigation of the case. While there is "no definite formula" for making this determination under § 1404(a), courts generally look to a familiar list of private interests and public interests implicated by the potential of transfer. *Jumara v. State Farm Insurance Company,* 55 F.3d 873, 879 (3d Cir. 1995).

**28.** It is irrelevant for venue purposes that the record contains no evidence that the advice in El–Batrawi's letter was read or followed specifically by any individual in Minnesota. *In re AES Corporation Securities Litigation,* 240 F.Supp.2d at 561 (showing of reliance by plaintiffs or others on misleading information transmitted into a district not required by § 78aa to establish venue; it is enough that the information was transmitted into the district in question).

The private interests that courts weigh in this context include plaintiff's forum preference as manifested in the original choice, the defendant's preference, convenience to parties and witnesses, the location of evidence, and whether the claim arose elsewhere. The public interests that courts take into account include the interests in judicial efficiency and consistency, the local interest in adjudicating local disputes locally, and the familiarity of the trial judge with the applicable state law. Both the private interests and the public interests—especially the interest in avoiding inconsistent results and maximizing judicial efficiency—weigh in favor of transferring this case.

## A. Private Interests

■ All of the Defendants named in CIBC's Complaint are defendants in at least two—and as many as all four—of the Minnesota actions. Requiring them to defend factually and legally related cases in both Minnesota and New Jersey would definitely cause them inconvenience that could be eliminated if the case were transferred.

Further, testimony of many of the same witnesses would be relevant to both CIBC's lawsuit and the Minnesota actions. Transferring the case would certainly be more convenient for these witnesses as it would mean they would be required to give one rather than two depositions, and possibly appear in one rather than two courtrooms.[29]

The location of documents does not weigh heavily either for or against transfer in this case. Although the trustee for MJK has already collected many relevant documents in Minnesota, Moving Brief at 8, he has scanned them onto CD–ROMs, which would make it simplicity itself to ship the information to New Jersey should the court deny the transfer motion. Opposition Brief at 31; Reply Brief at 12.

In "ruling on defendants' motion the plaintiff's choice of venue should not be lightly disturbed." *Jumara*, 55 F.3d at 879. This is especially true in cases arising under securities statutes, because "the intent of the venue and jurisdiction provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum." *See, e.g., Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir.1985). Courts defer less to a plaintiff's choice of forum,

---

**29.** CIBC points out that many of these witnesses are located in New Jersey. Opposition Brief at 30–31. This likely makes no difference, however, for two reasons. First, the witnesses would not necessarily have to venture far from home to give depositions if the case was transferred to Minnesota because depositions in this case will be occurring in numerous locations per agreement among counsel. *See* Reply Brief at 12. *See also* Notices submitted by Plaintiff of depositions scheduled for former Native Nations employees at the offices of Morgan Lewis & Bockius in New York, NY. Second, because there is significant factual overlap between CIBC's case and the Minnesota actions, if the New Jersey witnesses' testimony were required at a trial of CIBC's claims, it would likely be required at a trial of the Minnesota Plaintiffs' claims as well. Denial of the transfer motion would thus merely require the witnesses to appear twice in two different courtrooms; it would not save them a trip to the Land of 10,000 Lakes.

CIBC claims that several witnesses likely to be significant in this case—e.g., the five former employees of Native Nations and former RBF employees—live within the subpoena power of this court, but could not be compelled to testify in the Minnesota court. Opposition Brief at 31–32. There is no indication in the record, however, that subpoenas would be necessary to compel these witnesses to appear and testify. In fact, the fact that the Minnesota Plaintiffs felt comfortable filing their Complaints in Minnesota indicates the opposite, as the information these particular witnesses have will be as useful in the Minnesota actions as it would in CIBC's case.

however, when, as here, the plaintiff does not reside in that forum. 17–111 MOORE's FEDERAL PRACTICE Civil § 111.13[1][b][5][c][ii] (Matthew Bender 3d ed.). Further, even the importance of the plaintiff's choice of forum can be outweighed by other crucial factors such as promoting judicial economy and avoiding the possibility of inconsistent results. *See Crackau v. Lucent Technologies,* No. Civ. 03–1376, 2003 WL 22927231, at *6 (D.N.J. Nov. 24, 2003); *Lawrence v. Xerox Corp.,* 56 F.Supp.2d 442, 453 (D.N.J.1999).

On balance, the private interests in this matter would be served by transfer.

## B. *Public Interests*

■ Where, as here, related lawsuits are pending elsewhere, transferring a case serves not only private interests but also the interests of justice because it eliminates the possibility of inconsistent results, *Crackau,* 2003 WL 22927231, at *7; *Lawrence,* 56 F.Supp.2d at 454, and conserves judicial resources. In *Continental Grain Co. v. Barge FBL–585,* the Supreme Court noted that "to permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to wastefulness of time, energy and money that 1404(a) was designed to prevent." 364 U.S. 19, 26, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960). This court frequently has heeded this admonition and transferred a case to another forum when a related action was pending there. *See, e.g., Lawrence,* 56 F.Supp.2d at 453–55; *Ricoh Co. v. Honeywell, Inc.,* 817 F.Supp. 473, 487 (D.N.J.1993); *A.T.& T. v. MCI,* 736 F.Supp. 1294, 1307–1308 (D.N.J.1990); *Todd Shipyards Corp. v. Cunard Line Ltd.,* 708 F.Supp. 1440 (D.N.J.,1989).

It is evident from Judge Kyle's thorough September 8, 2003 Opinion that the Minnesota court has already expended significant effort in familiarizing itself with this case's highly complex factual background and thoughtfully applying the law to it. If the court denied Defendants' motion for transfer, this court would be required to duplicate that effort. Moreover, transfer would allow CIBC's case to be consolidated with the Minnesota actions for discovery purposes.

CIBC argues that transferring this case to the Minnesota court would not conserve judicial resources because, in significant ways, the Minnesota actions are *not* related to this case. CIBC's case and the Minnesota actions, however, are similar in far more ways than they are different.

It is true, as CIBC points out, that it is not a plaintiff in the Minnesota cases. The broker-dealers who are plaintiffs in the Minnesota cases, however, occupied a position in the lending chains Defendants structured that is precisely analogous to the position CIBC occupied. More importantly, many of the claims in both CIBC's Complaint and the Minnesota Complaints deal with conduct (e.g., Defendant's alleged manipulation of the market through various methods to artificially inflate Genesis stock's price) that does not directly involve the intermediate broker-dealers. Much of the information that will be instrumental in resolving the Minnesota actions and the CIBC case will thus be identical.

It is also true, as CIBC indicates, that there are some claims in CIBC's Complaint (i.e., the breach of contract claim and claims arising under New Jersey statutory and common law) that have no analogue in the Minnesota Complaints. Resolution of those claims will no doubt require findings of the same or similar facts as will be required for resolution of the claims in the Minnesota Complaints, however, so the Minnesota court could resolve them without much extra effort. Moreover, as the Moving Defendants point out, the Minne-

sota court is perfectly capable of—and has in the past—applied New Jersey law.

CIBC also argues that transfer will not serve the goal of efficiency because the Minnesota cases have progressed much further than its case has. Discovery has only recently begun in Minnesota,[30] however, and will continue until November 1, 2004 (fact discovery) and March 1, 2005 (expert discovery). *See* October 24, 2003 Pre-trial Scheduling Order. As Defendants make clear, Reply Brief at 10–11, it would be simple for CIBC to be brought up to speed, and for discovery to be coordinated, if the court transferred this case. Further, the fact that the Minnesota court has already resolved the Minnesota Defendants' motions to dismiss is not a reason, as CIBC argues, for the court to deny the transfer motion; rather, it is the reason the Minnesota court has such detailed knowledge of the case, which is, in turn, the primary reason transfer is appropriate.

CIBC next maintains that the local interest in adjudicating localized disputes counsels against transfer. However, while several of the Defendants are indeed based in New Jersey and some of D'Angelo's stock trades that manipulated the price of Genesis stock occurred in New Jersey, the scheme giving rise to CIBC's lawsuit is hardly a "localized dispute." Many of the Defendants are based in places as far away from New Jersey as Canada, Bermuda and California. Furthermore, several of the acts central to the violation of which CIBC complains were allegedly performed outside of New Jersey. CIBC loaned stock to DBSL, for example, in Toronto.

CIBC argues that the lighter backlog in this court relative to its Minnesota counterpart counsels against transfer. A backlog of cases, while not irrelevant, is, however, "insufficient to prevent a § 1404(a)

transfer which is otherwise mandated by the convenience of the parties and witnesses." *Burstein v. Applied Extrusion Technologies, Inc.*, 829 F.Supp. 106, 114 (D.Del.1992).

Finally, CIBC argues that transfer is inappropriate because litigation arising out of the fraudulent scheme at the center of the case has occurred in California, New York and Pennsylvania, as well as New Jersey and Minnesota. The fact that so much litigation in so many places has occurred, however, counsels in favor of simplifying as much as possible. Just because this court cannot make the resolution of these disputes simple does not mean it should not endeavor to make it *simpler* by transferring this case to Minnesota.

## CONCLUSION

For all the reasons stated above, the court will grant the Moving Defendants' motion to transfer.

---

30. The Moving Defendants indicated at oral argument that 50–100 depositions will be taken over the spring and summer, and only two

of those depositions have already begun (and have not even concluded).