Eui Seob KIM, by for the Cleaners Co.,
Ltd., and Chang Hi Kim, Plaintiffs

v.

Su Heon KIM, and by for the Cleaners,
Inc., Defendants

No. Civ.A.04–0018.

United States District Court,
E.D. Pennsylvania.

June 29, 2004.

Raja Rajan, Law Offices of Young K. Park, Philadelphia, PA, for Plaintiffs.

Anne E. Kane, James D. Shupe, Stephen Andrew Fogdall, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

RUFE, District Judge.

This action stems from the parties' efforts to develop, manufacture and distribute machines utilized in a "wet cleaning" process for "dry-clean only" clothing. Defendants move to dismiss this case under the anticipatory filing doctrine, and for lack of personal jurisdiction, improper venue and insufficient service of process. In the alternative, Defendants move to transfer this case to the United States District Court for the Northern District of Illinois. For the reasons below, the Court will deny the motion to dismiss and grant the motion to transfer.

## I. BACKGROUND

■ Plaintiffs Eui Seob Kim, Chang Hi Kim and By For the Cleaners Co., Ltd. ("BFTC–Korea") bring this action against Defendants Su Heon Kim and By For the Cleaners, Inc. ("BFTC–Illinois"). Eui Seob Kim is a Pennsylvania resident. Chang Hi Kim is a South Korea resident. BFTC–Korea is a South Korean corporation with its principal place of business in South Korea. Su Heon Kim is a resident of Illinois. BFTC–Illinois is an Illinois corporation with its principal place of business in Illinois. Jurisdiction is based on diversity of citizenship.[1] Because the Court is considering a motion to dismiss for lack of personal jurisdiction, the following factual recitation is drawn from Plaintiffs' allegations and the many disputed facts are construed in favor of Plaintiffs.[2]

Plaintiff Eui Seob Kim and Defendant Su Heon Kim are both inventors of dry-cleaning machines and products. In the spring of 2002, they met at a trade show in Atlanta and discussed their respective inventions. After the trade show, Su Heon Kim called Eui Seob Kim in Philadelphia and invited him to attend a seminar in Chicago where Su Heon Kim planned to present his ideas for a wet cleaning process that avoids using environmentally-harmful chemicals to wash "dry clean only" clothing. As Eui Seob Kim had his own ideas for inventing wet cleaning machines, he accepted the invitation and attended the Chicago seminar in October 2002.

After Eui Seob Kim returned to Philadelphia from Chicago, Su Heon Kim called him and suggested they pursue a joint venture to develop and manufacture wet

---

1. See 28 U.S.C. § 1332.

2. See *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir.2002). Because Plaintiffs' filings do not present a complete narrative of events, the Court draws from Defendants' version to fill in some gaps.

cleaning washers and dryers. Su Heon Kim recruited Eui Seob Kim because of his scientific and technical expertise in dry cleaning machinery. They arranged a future meeting to discuss the joint venture.

In November 2002, Su Heon Kim traveled to Philadelphia and met with Eui Seob Kim at a hotel near the airport. Plaintiff Chang Hi Kim also attended the meeting as a representative of Chang Shik Park, a Korean businessman who had helped Su Heon Kim develop earlier inventions. After a four-to-five hour meeting, the parties reached an oral agreement whereby Eui Seob Kim would develop the technical specifications for a wet cleaning machine and would own all patent rights. Thereafter, Chang Shik Park would form a South Korean company to manufacture the machines in South Korea, and eventually Su Heon Kim and his company, BFTC–Illinois, would establish a dealer network to market the machines. After the meeting, Su Heon Kim stayed overnight in Philadelphia and returned to Chicago the next day.

Eui Seob Kim and Su Heon Kim continued to discuss invention of the machines via telephone, and they agreed to meet again in Philadelphia in December 2002. In the meantime, unbeknownst to Eui Seob Kim, Su Heon Kim filed his first provisional United States Patent application for a wet cleaning dryer on November 22, 2002. Eui Seob Kim now contends that this application and three of Su Heon Kim's related subsequent applications include Eui Seob Kim's design drawings and other work product but were submitted under Su Heon Kim's name only. Eui Seob Kim claims that Su Heon Kim's applications are contrary to the oral agreement that Eui Seob Kim would own all patent rights in the subject machines.

On December 10, 2002, Chang Shik Park and Su Heon Kim met in Chicago and flew together to Philadelphia, where they met Eui Seob Kim at the airport. The three men then immediately drove to Leesburg, Virginia to observe wet cleaning processes in use at The Laundry Club, Inc. Eui Seob Kim claims that while visiting The Laundry Club, Inc., he developed a new idea for using ice water in the wet cleaning process, and he asked Su Heon Kim to test the "ice water idea." The group stayed overnight in Leesburg and drove back to the Philadelphia airport the next day. Su Heon Kim flew back to Chicago from Philadelphia.

In furtherance of the business venture, Eui Seob Kim created drawings and gathered technical information in Philadelphia and sent them to Su Heon Kim in Chicago, who tested the "ice water idea" and reported favorable results to Eui Seob Kim. Soon thereafter, Eui Seob Kim visited Su Heon Kim in Chicago to see the results for himself. During this visit, Eui Seob Kim developed an idea for a dryer to be used in the wet cleaning process. Beginning in January 2003, Su Heon Kim paid Eui Seob Kim $6,000 a month for his services, eventually paying a total of $42,000 through July 2003. Su Heon Kim sent at least one of these payments to Eui Seob Kim in Philadelphia.

Meanwhile, Chang Hi Kim and Chang Shik Park formed a company in South Korea, BFTC–Korea, to develop and manufacture the washer and dryer prototypes and eventually the finished machines. Su Heon Kim began forming a dealer network in the United States and laid plans to market the machines through BFTC–Illinois under his trademark, "FEORI." He collected fees from these dealers, and in January 2003, advanced approximately $90,000 to BFTC–Korea to hasten manufacture of the prototypes. In February 2003, Eui Seob Kim traveled to South Ko-

rea to oversee the manufacturing of his inventions.

In April 2003, BFTC–Korea shipped the completed prototypes to Su Heon Kim in Illinois. After successfully testing the prototypes, Su Heon Kim and BFTC–Illinois agreed to purchase from BFTC–Korea approximately twenty additional wet cleaning washers and dryers for approximately $25,000 per washer-dryer set.

On May 3, 2003, Su Heon Kim and BFTC–Illinois executed a contract designating Chang Hi Kim as the exclusive distributor for FEORI products in the northeastern United States (the "Exclusive Distributor Agreement"). As consideration for this right, Chang Hi Kim paid a $200,000 fee. Chang Hi Kim alleges that Su Heon Kim and BFTC–Illinois later breached the Exclusive Distributor Agreement by permitting other distributors to deal FEORI products in Chang Hi Kim's exclusive territory.

In late August 2003, BFTC–Korea sought additional investment from an unnamed individual who had expressed interest in the machines. The investor requested written confirmation of BFTC–Korea's manufacturing rights and documentation of the patent rights for the machines. By this time, Eui Seob Kim had learned about Su Heon Kim's allegedly fraudulent patent applications. He and a BFTC–Korea representative (presumably Chang Hi Kim) explained to the investor that they were the real owners of the patent rights to the machines and that Su Heon Kim's patent applications were improper. Nonetheless, the investor insisted on written acknowledgment from Su Heon Kim confirming Eui Seob Kim and BFTC–Korea's rights.

Accordingly, a BFTC–Korea representative (presumably Chang Hi Kim) and Su Heon Kim agreed in a telephone conversation to the terms of an agreement outlining the parties' respective rights and obligations ("Acknowledgment Agreement"). When reduced to writing, the October 9, 2003 Acknowledgment Agreement provided, in sum: (1) BFTC–Illinois will not transfer, acquire, buy or sell the patent rights for the wet cleaning machines; (2) BFTC–Korea owns exclusive manufacturing rights for the wet cleaning machines, and BFTC–Illinois will not deprive BFTC–Korea of those rights for any reason; (3) BFTC–Korea will create a new company, Company A, and until that company is established Chang Hi Kim will represent Company A; (4) beginning in January 2004, every month BFTC–Illinois will order "about 50 units" from Company A "by issuing irrevocable L/C [letter of credit]"; (5) BFTC–Illinois will not change the price or number of machines ordered without BFTC–Korea's permission; (6) if BFTC–Illinois fails to order 50 units every month, "Company A will conduct business independently in the U.S. market"; and (7) BFTC–Korea and BFTC–Illinois will comply with the Acknowledgment Agreement until expiration of the patent rights.[3] Despite having agreed to these terms orally, Su Heon Kim refused to sign a written copy of the Acknowledgment Agreement. As a consequence, negotiations with the investor proceeded no further.

From August to October 2003, Su Heon Kim ordered via telephone a "substantial number" of the wet cleaning machines, and promised to make a partial payment to BFTC–Korea of approximately $700,000 by the end of October 2003.[4] BFTC–Korea manufactured the requested machines,

---

**3.** *See* Compl. Ex. B. All quotations are taken from an English translation of the original Korean text.

**4.** Compl. ¶¶ 59–60.

but Su Heon Kim failed to pay any amount by the deadline. Because BFTC–Korea had expended substantial sums in filling the oral purchase orders, Su Heon Kim's failure to pay caused BFTC–Korea to suffer financial difficulty.

To surmount its financial difficulties, BFTC–Korea applied for a loan from a South Korean bank. In support of its loan application, BFTC–Korea asked Su Heon Kim to provide documents acknowledging BFTC–Korea and Eui Seob Kim's rights regarding the machines. They also asked Su Heon Kim to provide written purchase orders documenting his previous oral purchase orders. On November 10, 2003, Su Heon Kim sent purchase orders for the machines totaling $2,150,000.[5] In addition, Su Heon Kim's attorney sent a letter to the South Korean bank alleging that Su Heon Kim and BFTC–Illinois are the sole owners of pending patent rights and manufacturing rights for the wet cleaning machines. Based on assertions in this letter, the bank refused to approve a loan to BFTC–Korea.

On November 12, 2003, Chang Hi Kim sent a letter on behalf of BFTC–Korea to Su Heon Kim, BFTC–Illinois, and their network of dealers. The letter terminated the business relationship between BFTC–Korea and BFTC–Illinois due to a "breach of trust" on several fronts. First, the letter stated that Su Heon Kim had collected money from U.S. dealers but had failed to forward these monies to BFTC–Korea. Second, it accused Su Heon Kim of falsely "publicizing" that Eui Seob Kim was Su Heon Kim's employee, and that Eui Seob Kim was about to be fired.

Third, the letter states that Eui Seob Kim is the only rightful owner of any patent rights in the machines, and therefore BFTC–Korea would from then on work with Eui Seob Kim and his company, Green Sense, to "manufacture and operate A/S for the machines."[6] Fourth, it contended that Su Heon Kim had done a poor job marketing the machines, resulting in poor sales, and that even when sales were good, he had failed to send money to BFTC–Korea. Finally, the letter stated that BFTC–Korea had filled $525,000 in purchase orders from dealers and would not be responsible for providing any additional machines or parts, but that it would "take charge of A/S for already delivered machines in good faith."[7]

Plaintiffs allege that after receiving this letter, Su Heon Kim and BFTC–Illinois began contacting other manufacturers about producing the wet cleaning machines invented by Eui Seob Kim, thereby misappropriating intellectual property and violating the parties' oral agreements. Defendants, on the other hand, contend that Plaintiffs continued to manufacture machines based on Su Heon Kim's designs, and that Plaintiffs marketed the "knock-off" machines under the trademark "FRIO"—which is "confusingly similar" to Se Heon Kim's FEORI trademark.[8]

In response to the November 12, 2003 letter, counsel for Su Heon Kim and BFTC–Illinois sent a November 19, 2003 letter to Eui Seob Kim in Pennsylvania, accusing him of engaging in a libelous and otherwise illegal conspiracy to destroy his clients' business. The letter threatens le-

---

5. *See* Compl. Ex. C. Purchase Orders # 1010031 & 1010032 contain mathematical errors that overstate the total amount ordered, which apparently led Plaintiffs to state incorrectly in Complaint ¶ 65 that the purchase orders total $2,289,000.

6. It is not clear what "A/S" means.

7. Compl. Ex. D (English translation).

8. Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 7.

gal action in the United States and Korea unless Eui Seob Kim retracted the November 12, 2003 letter and apologized to its recipients. The letter also demands that Eui Seob Kim cease using the FEORI and By For The Cleaners names, and that Su Heon Kim and BFTC–Illinois would enforce its trademark, patent and business rights against Eui Seob Kim to prevent destruction of Su Heon Kim's business. The letter concludes by stating that unless these demands are met, "we have been authorized by [Su Heon Kim] to proceed with bringing suit against you. We await your response. You have ten (10) days to do so." [9]

On November 22, 2003, Chang Hi Kim, on behalf of BFTC–Korea, sent a facsimile to Su Heon Kim stating that machines he had ordered prior to termination of their business relationship were now ready and demanding payment for them. The facsimile warned that a lawsuit would follow if Su Heob Kim did not pay for the machines by November 30, 2003. The facsimile did not refer to counsel's November 19, 2003 letter.

On December 3, 2003, Chang Hi Kim, on behalf of himself only, sent a facsimile to Su Heon Kim and BFTC–Illinois, accusing Su Heon Kim of breaching the Exclusive Distributor Agreement and demanding return of the $120,000 [10] fee he had paid for the distribution rights. The facsimile concluded, "I sincerely hope that it will not be necessary for me to bring a lawsuit, whether it is civil or criminal, to figure out this matter." [11] On December 15, 2003, Chang Hi Kim sent a second facsimile threatening a lawsuit if he did not receive $120,000 by December 31, 2003. Neither facsimile referred to counsel's November 19, 2003 letter.

On December 19, 2003, counsel for Su Heon Kim and BFTC–Illinois sent a facsimile to Eui Seob Kim, stating, "As we have had no conciliatory response from you to our November 19, 2003 letter, we advise you Mr. Su Heon Kim and his company, [BFTC–Illinois] are proceeding with action against you." [12]

On January 2, 2004, Eui Seob Kim, Chang Hi Kim and BFTC–Korea filed the instant action against Su Heon Kim and BFTC–Illinois, alleging ten counts: (1) misappropriation of trade secrets; (2) conversion of intellectual property; (3) breach of fiduciary duty; (4) breach of the Exclusive Distributor Agreement; (5) breach of the Acknowledgment Agreement; (6) breach of purchase orders; (7) promissory estoppel; (8) a request for a preliminary injunction; (9) unjust enrichment/quantum meruit; and (10) fraud/misrepresentation.

On March 2, 2004, before Plaintiffs filed proof of service of the Complaint in this action, Su Heon Kim and BFTC–Illinois filed a complaint in the United States District Court for the Northern District of Illinois, Eastern Division, civil action number 04–1649 ("Chicago Action"). The Chicago Action proceeds against Eui Seob Kim, Green Sense Machinery & Services (Eui Seob Kim's company), Chang Hi Kim, BFTC–Korea, Chang Shik Park, and three other individuals, alleging claims under the Lanham Act, 15 U.S.C. § 1125(a), the Illinois Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 *et seq.*, common law

---

**9.** Defs.' Mot. to Dismiss Ex. C.

**10.** This contradicts Plaintiffs' assertion in ¶ 46 of the Complaint that Chang Hi Kim paid $200,000 for the distribution rights. The parties offer no explanation, but the discrepancy is not important to today's decision.

**11.** Pls.' Resp. Ex. D.

**12.** Defs.' Mot. to Dismiss Ex. D.

unfair competition and trademark infringement, libel, slander and multiple counts of breach of contract and interference with contractual relations.

During March and April 2004, a dispute arose in this Court concerning Plaintiffs' alleged failure to properly serve Defendants and Plaintiffs' request for entry of a default judgment. The details of that dispute are irrelevant to today's decision. Eventually, the Court directed Defendants to consolidate their arguments (and any others) in a motion pursuant to Federal Rule of Civil Procedure 12. On May 6, 2004, Defendants filed their Motion to Dismiss, arguing that: (1) the case should be dismissed under the anticipatory filing doctrine; (2) the Court lacks personal jurisdiction over Defendants; (3) venue is improperly laid; and (4) the case should be dismissed for insufficient service of process. In the alternative, Defendants ask the Court to transfer this action to the United States District Court for the Northern District of Illinois for resolution alongside the Chicago Action.

For purposes of this Memorandum Opinion, the Court assumes that Defendants were properly served but otherwise addresses each argument in turn.

## II. ANTICIPATORY FILING DOCTRINE

■■■ Under the familiar "first-filed" rule, in "all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it." [13] The rule's primary purposes are to "avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments." [14] If the first-filed rule is to be applied here, as a matter of comity the Chicago Action should be dismissed or stayed pending resolution of the instant matter, which is the first-filed case. [15]

■■ Defendants urge the Court to depart from the first-filed rule, which it may do when confronted with "rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping." [16] Defendants argue that rejecting the first-filed rule is appropriate where, as here, "the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable forum." [17] They contend that Plaintiffs engaged in a "race to the courthouse" by filing this action in Eui Seob Kim's local forum (Philadelphia) only to preempt Defendants from litigating this dispute in their local forum (Chicago). There are no hard and fast rules governing whether to depart from the first-filed rule; rather, the Court must act "with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." [18]

---

**13.** *Equal Employment Opportunity Comm'n v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir.1988) (hereinafter, *"EEOC"*) (citation omitted), *aff'd on other grounds*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).

**14.** *Id.* at 977 (citations omitted).

**15.** It is also within this Court's power to enjoin the parties from proceeding with the Chicago Action. *See* 6 Charles Alan Wright, Arthur R. MIller & Mary Kay Kane, *Federal Practice and Procedure* § 1418, at 144–45 ˉ(2d

ed. 1990) ("[I]t is within the judicial discretion of the federal court in which the first action is pending to enjoin the parties from proceeding with the second suit.").

**16.** *EEOC*, 850 F.2d at 972.

**17.** *Id.* at 976 (citations omitted).

**18.** *Id.* at 977 (quoting *Langnes v. Green*, 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520 (1931)).

This case does not present the kind of exceptional circumstances warranting departure from the first-filed rule. First, there is no evidence that forum shopping was the "sole motivating factor" in Plaintiffs' decision to file suit in this Court.[19] Unlike *EEOC*, this is not a case where the plaintiff filed suit in a particular forum to avoid unhelpful law or benefit from favorable law.[20] Rather, given that Eui Seob Kim resides in this district and his co-plaintiffs reside abroad, it appears Plaintiffs pursued this action in the Eastern District of Pennsylvania as a matter of convenience. This is a rather unexceptional circumstance that gives the Court no reason to depart from the first-filed rule.

■ More significantly, based on the parties' correspondence leading up to this and the Chicago Action, there is little reason to believe that the instant matter is an improper anticipatory filing. During November and December 2003, the parties exchanged letters airing their disagreements over different issues, with each side threatening litigation. Defendants' November 19, 2003 letter from counsel to Eui Seob Kim complained of libel, interference with business relations, and misuse of the FEORI trademark. The letter delivered the first shot across the bow by noting that counsel "have been authorized by [Su Heon Kim] to proceed with bringing suit against you" and demanding a satisfactory response within ten days. Had Eui Seob Kim then filed the instant action within the ten day grace period, Defendants would have a much stronger argument that the filing was improper.[21]

What ensued, however, was *not* a rush to the courthouse. On November 22, 2003, BFTC–Korea sent a facsimile attempting to cajole Su Heon Kim into paying for machines that he had ordered before the business relationship deteriorated and threatening litigation if no payment was forthcoming. Soon thereafter, Chang Hi Kim sent two facsimiles threatening litigation unless Defendants paid $120,000 by December 31, 2003 for breach of the Exclusive Distributor Agreement. Next, Defendants' December 19, 2003 facsimile notified Plaintiffs that "we are proceeding with action against you." Consistent with his threat, Chang Hi Kim filed suit in this Court on January 2, 2004 (joined by co-plaintiffs BFTC–Korea and Eui Seob Kim). Finally, Defendants made good on their threat by filing the Chicago Action two months later.

The Court finds nothing exceptional in these circumstances warranting departure from the first-filed rule. To the contrary, the parties' correspondence is consistent with the saber-rattling attendant to the demise of many business relationships. Defendants note that they directed their threats at Eui Seob Kim's alleged patent infringement, while Chang Hi Kim and BFTC–Korea directed their threats at De-

---

19. *Moore Corp. Ltd. v. Wallace Computer Servs., Inc.*, 898 F.Supp. 1089, 1099 (D.Del. 1995).

20. *See EEOC*, 850 F.2d at 978 ("[T]he University's effort to evade a decision in this Circuit violates the equitable basis for the [first-filed] rule.... Because the first-filed rule is based on principles of comity and equity, it should not apply when at least one of the filing party's motives is to circumvent local law and preempt an imminent ... action [in the local forum].").

21. *See, e.g., id.* at 977 (when the EEOC threatened action to enforce a subpoena if the University did not comply within twenty days, and the University filed suit in the District of Columbia during the twenty day grace period, "the University's filing in the District of Columbia indicates an attempt to preempt an imminent subpoena enforcement in the Eastern District of Pennsylvania").

fendants' alleged breaches of contract. Defendants contend that Eui Seob Kim rushed to the courthouse with his intellectual property-related claims, and that Chang Hi Kim is a "nominal" plaintiff in Eui Seob Kim's "bald attempt to prevent defendants from taking legal action in Chicago."[22]

Defendants' argument is unpersuasive. First, Defendants completely misconstrue the Complaint: Chang Hi Kim is party to four of ten counts, BFTC–Korea is party to six of ten counts, and Eui Seob Kim is party to seven of ten counts. Although Eui Seob Kim's claims may predominate, it cannot be said that BFTC–Korea (whom Defendants apparently ignore) and Chang Hi Kim are merely nominal parties. Second, there is no reason to believe that Eui Seob Kim sought to prevent Defendants from taking legal action in Chicago. The November 19, 2003 letter from Defendants' attorney threatened litigation in the "United States" or "Korea." Even if Eui Seob Kim *reacted* to this letter (as opposed to proceeding according to previous intentions) by filing a lawsuit in Philadelphia that joined his and his joint venturers' claims arising from the same business venture—a venture that began in Philadelphia—the Court cannot divine any bad faith or improper conduct from this course of events. Nor does any lack of symmetry in the exchange of letters give the Court much pause.

Taking all circumstances into account, there appears to be nothing improper about the timing of this lawsuit or Plaintiffs' choice of forum. Accordingly, because there is no evidence before the Court compelling dismissal of this case as a matter of equity, the Court will not depart from the first-filed rule.

## III. PERSONAL JURISDICTION

█ Defendants move to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. This Court may exercise jurisdiction over non-resident defendants to the extent permitted by Pennsylvania law. Pennsylvania's long-arm statute authorizes the exercise of personal jurisdiction to the fullest extent permitted under the Due Process Clause of the Fourteenth Amendment.[23]

█ When a defendant raises the defense of lack of personal jurisdiction, the plaintiff must come forward with sufficient facts to establish that jurisdiction is proper. The plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state."[24] Where, as here, jurisdiction over the defendant is premised not on systematic and continuous contacts but on claim-specific contacts, the plaintiff must show that each of its causes of action arises out of the defendant's forum-related activities, "such that the defendant should reasonably anticipate being haled into court."[25] This determination is "claim-specific," such that personal jurisdiction may exist for some of the plaintiffs' claims but not for others.[26]

█ Once the plaintiff has established sufficient minimum contacts between the

---

**22.** Defs.' Reply at 3–4 n.2.

**23.** *See Remick v. Manfredy,* 238 F.3d 248, 255 (3d Cir.2001); 42 Pa. Cons.Stat. Ann. § 5322(b).

**24.** *Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992).

**25.** *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

**26.** *Remick,* 238 F.3d at 255.

defendant and the forum state, then the Court will consider "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." [27] At this stage of the analysis the defendant bears the burden of showing a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." [28]

### A. BFTC–Korea and Chang Hi Kim's Claims

■ BFTC–Korea's claims arise from an alleged breach of the Acknowledgment Agreement and alleged breaches of purchase order agreements. Chang Hi Kim's claims arise from an alleged breach of the May 3, 2003 Exclusive Distributor Agreement.[29] Plaintiffs argue that the Court may assert jurisdiction over Defendants for these claims because (a) the contracts at issue all grew out of the joint venture that initially began in Philadelphia, and (b) "some of the marketing violations by Defendants that the Plaintiffs in Korea complain [sic] are Defendants' specific sales of goods into Pennsylvania and away from Plaintiffs." [30] The Court disagrees be-cause the connection between these claims and Defendants' forum-related activities is attenuated at best.

There is no evidence before the Court regarding Defendants' sales or marketing efforts in Pennsylvania. More importantly, however, the negotiation, terms, subject and performance of the contracts at issue have nothing to do with Pennsylvania.[31] Although the parties initially agreed as a general matter to undertake a joint venture during the November and December 2002 meetings in Philadelphia, each of the contracts at issue arose much later (May, August, September and October 2003), and involved specific, discrete aspects of bringing the machines to market. Moreover, there are no allegations or evidence that these agreements were reached while any party was in Pennsylvania.[32]

Defendants would not reasonably anticipate being haled into court in Pennsylvania for alleged breaches of contracts that were not negotiated in Pennsylvania, did not give rise to rights or obligations of any Pennsylvania resident, and did not otherwise involve any contact with Pennsylvania. That the parties to the contracts

---

**27.** *Mellon Bank*, 960 F.2d at 1222.

**28.** *Id.* at 1226.

**29.** BFTC–Korea and Chang Hi Kim are both parties to Count 10 of the Complaint, which alleges that Su Heon Kim fraudulently induced all Plaintiffs to enter into the joint venture. However, because BFTC–Korea and Chang Hi Kim's rights vis-a-vis Su Heon Kim and BFTC–Illinois are contained in specific agreements governing the joint venture, the jurisdictional analysis is more appropriately focused on the factual circumstances surrounding those agreements, as opposed to the general agreement to undertake the joint venture, which is the subject of Count 10.

**30.** Pls.' Resp. at 10.

**31.** *See Remick*, 238 F.3d at 256 ("In determining jurisdiction over a breach of contract claim, we must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing.").

**32.** *See* Compl. ¶¶ 44–48 (recounting terms of Exclusive Distributor Agreement and Defendants' breach thereof); *id.* ¶¶ 53–57 (recounting Acknowledgment Agreement accord reached during telephone conversation, and BFTC–Korea's faxing it to Su Heon Kim); *id.* ¶¶ 59–62 (recounting Su Heon Kim's oral purchase orders and breaches thereof). Although the Complaint and evidence before the Court are unclear, common sense would dictate that the parties reached these agreements while BFTC–Korea and Chang Hi Kim were in South Korea and Defendants were in Illinois.

initially joined forces in Pennsylvania is simply insufficient. Accordingly, the Court lacks jurisdiction over BFTC–Korea and Chang Hi Kim's claims against Defendants.

## B. Eui Seob Kim's Claims

Although Eui Seob Kim is party to several counts of the Complaint, he essentially alleges two separate tort claims[33] against Defendants: (i) that Su Heon Kim misappropriated Plaintiff's intellectual property, i.e., his wet cleaning inventions;[34] and (ii) that Su Heon Kim fraudulently induced him to enter into a business relationship.[35] The Court analyzes these claims separately.

### 1. Eui Seob Kim's Misappropriation Claims

■ On the record before the Court, Su Heon Kim's only contacts with Pennsylvania consist of two brief visits in the fall of 2002, one payment sent to Eui Seob Kim, and an unspecified number of telephone and other communications with Eui Seob Kim. His opportunities to misappropriate Eui Seob Kim's inventions arose either in Virginia or Illinois. During the joint venturers' visit to The Laundry Club,

Inc. in Virginia, Eui Seob Kim developed his new idea for a wet cleaning process using ice water, explained it to Su Heon Kim, and asked him to test the idea. Similarly, Eui Seob Kim claims to have developed his idea for a dryer while in Chicago, where he discussed the idea with Su Heon Kim.[36] Although Eui Seob Kim developed drawings and technical information for the inventions while working in Philadelphia, he communicated those ideas to Su Heon Kim's Chicago office. Moreover, once Eui Seob Kim's machines became a finished product, BFTC–Korea shipped the machines to Chicago, thus providing Su Heon Kim an opportunity to examine them further and misappropriate the ideas behind the inventions. Accordingly, the question presented is whether the Court may assert personal jurisdiction over Su Heon Kim for torts committed outside of Pennsylvania.

■ ■ In these circumstances the Court must apply the "effects test" from the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). As articulated by the Third Circuit, a Court may exercise jurisdiction over a nonresident for his inten-

---

**33.** Defendants contend that some of Eui Seob Kim's are really contract claims, but the Court concludes otherwise. Count 3 alleges breach of fiduciary duty and Count 9 alleges unjust enrichment/quantum meruit, but both are based on Defendants' alleged *tortious* misappropriation of Eui Seob Kim's inventions. Count 5 alleges breach of the Acknowledgment Agreement, but Eui Seob Kim is not a party to that contract and thus cannot seek redress for any alleged breach thereof. Count 8 is a general count seeking a preliminary injunction "to prevent any further actions to interfere with Plaintiffs' valid rights...." Compl. p. 14 (prayer for relief).

**34.** *See* Compl. Count 1 (alleging "misappropriation of trade secrets"); Count 2 (alleging "conversion of intellectual property"); Count 3 (alleging "breach of fiduciary duty"); Count

8 (seeking injunction to prevent Su Heon Kim from interfering with Eui Seob Kim's "valid intellectual property rights"); and Count 9 (alleging "unjust enrichment/quantum meruit" where Su Heon Kim "acted well beyond" his "right to the invention and machins [sic]").

**35.** See Compl. Count 10 (alleging "Defendant fraudulently induced Plaintiff into a business relationship with his statements and his monies."). Count 10 also alleges claims of fraud relating to intellectual property rights, but the Court views those claims as subsumed by Eui Seob Kim's misappropriation claims. *See* Compl. ¶¶ 138–39.

**36.** Compl. ¶¶ 19–25; Eui Seob Kim Decl. ¶¶ 25–30.

tional torts committed outside the forum where the plaintiff shows:

    (1) The defendant committed an intentional tort;

    (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and

    (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.[37]

The first factor is unquestionably satisfied. As to the second factor, because Eui Seob Kim and his business is based in the Philadelphia area, he can make a colorable argument that the brunt of the harm was felt in this forum. However, given that this case primarily concerns Eui Seob Kim's efforts to bring his inventions to market through a company in South Korea, this issue is not clearly resolved in Eui Seob Kim's favor. In any event, Eui Seob Kim cannot demonstrate the third factor: that Pennsylvania was the focal point of Su Heon Kim's tortious activity.

    Pennsylvania is not the focal point of the tortious conduct merely because the victim's principal place of business is located here; rather, "[t]he defendant must manifest behavior intentionally targeted at and focused on the forum for *Calder* to be

satisfied."[38] Plaintiffs have failed to establish that Su Heon Kim targeted Pennsylvania in the course of his alleged wrongdoing. For example, there is no evidence that Su Heon Kim converted Eui Seob Kim's intellectual property and utilized it to garner Pennsylvania customers as opposed to customers located anywhere else.[39] Other than the fortuitous fact of Plaintiff's residency, Pennsylvania has little connection to Su Heon Kim's alleged misappropriation of trade secrets or conversion of intellectual property.[40] The Court views this claim in the context of the overall dispute. Here, Eui Seob Kim's injury arose from the alleged misappropriation when Su Heon Kim allegedly took Eui Seob Kim's ideas and marketed them as his own. This occurred only after the collapse of Su Heon Kim's business relationship with the invention's legitimate supplier, BFTC–Korea. Thereafter, Plaintiffs allege, Su Heon Kim used Eui Seob Kim's trade secrets to his advantage and to Plaintiffs' detriment. Taken in that context, if Su Heon Kim directed his tortious conduct toward any particular place, he aimed it at his former joint venturers' activities in South Korea and at the situs of the wet cleaning market generally. The scope of that market is not a matter of record, but it clearly extends beyond Pennsylvania. In any event, there is simply no evidence that Pennsylvania played

**37.** *Remick*, 238 F.3d at 258 (quoting *Imo Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir.1998)).

**38.** *Imo Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir.1998).

**39.** *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir.1997) (defendant focused its tortious activity "generally on customers located throughout the United States and Canada without focusing on and targeting South Carolina"); *Directory Dividends, Inc. v. SBC Communications, Inc.*, No. Civ.01–CV–1974, 2003 WL 22533708, at *4

(E.D.Pa. Oct.23, 2003) (concluding defendant did not expressly aim his torts at Pennsylvania where plaintiff had nationwide business and defendant did not target plaintiff's "strictly Pennsylvania accounts").

**40.** *See ESAB Group, Inc.*, 126 F.3d at 625 (defendants' knowledge that they misappropriated trade secrets from a South Carolina plaintiff, "intended to gain a competitive advantage" thereby, and knew they would hurt plaintiff's sales in South Carolina does not "manifest behavior intentionally targeted at and focused on South Carolina").

any special role in Defendants' alleged scheme.

Plaintiffs have failed to meet their burden to establish that Su Heon Kim expressly aimed his tortious conduct at Pennsylvania such that it can be said to be the focal point of the tortious activity. Accordingly, Plaintiffs cannot satisfy the *Calder* effects test, and the Court cannot assert jurisdiction over Eui Seob Kim's tort claims against Defendants.

### 2. Eui Seob Kim's Fraudulent Inducement Claim

█ Eui Seob Kim alleges that Su Heon Kim solicited his services in Philadelphia, that they negotiated the joint venture in Philadelphia, and that they reached an oral agreement to undertake the joint venture while in Philadelphia. In Count 10 of the Complaint, Eui Seob Kim alleges that "Defendant fraudulently induced Plaintiff into a business relationship with his statements and his monies." [41] In essence, Plaintiff alleges a fraudulent statement made in Pennsylvania to a Pennsylvania resident. Under Third Circuit precedent, these allegations are sufficient to establish a *prima facie* case of jurisdiction in this Court: "Personal jurisdiction may be exercised over a nonresident defendant who, while present in the forum state, makes a deliberate misrepresentation during the course of negotiations

or other direct oral communications with the plaintiff." [42]

█ In these circumstances, Su Heon Kim could reasonably expect to be haled into a Pennsylvania forum to account for his allegedly tortious conduct. Moreover, he has failed to demonstrate a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Accordingly, the Court may exercise personal jurisdiction over Su Heon Kim for his allegedly fraudulent statements to Plaintiffs in Pennsylvania. However, as explained below, the Court agrees with Su Heon Kim that this case should be transferred to the United States District Court for the Northern District of Illinois. [43]

### IV. VENUE

Defendants argue that this action should be dismissed because venue is improper under 28 U.S.C. § 1391 and on grounds of *forum non conveniens*. In the alternative, Defendants ask for a transfer to the Northern District of Illinois. For the following reasons, the Court concludes that a transfer is appropriate.

█ Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." There is no question that

---

**41.** Compl. ¶ 140.

**42.** *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir.1992) (finding personal jurisdiction where defendant came to the forum state and made fraudulent statements and omissions during meeting with plaintiff); *see also 99 Stores, Inc. v. Dynamic Distribs.*, No. Civ.A.97–3869, 1998 WL 24338, at *2 (E.D.Pa. Jan.22, 1998) ("Engel allegedly made fraudulent statements in Pennsylvania to Pennsylvania residents, with the expectation that those Pennsylvania residents would act upon them. These acts in the forum are

sufficient to meet the requisite minimum contacts.").

**43.** The Court's lack of jurisdiction over BFTC–Korea and Chang Hi Kim's claims is no barrier to transferring this case. *See, e.g., Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 544 (3d Cir.1985) ("[A] district court lacking personal jurisdiction can transfer a case to a district in which the case could have been brought originally.") (citations omitted).

the action could have been filed in the Northern District of Illinois where Defendants reside.[44] The only question, therefore, is whether the interest of justice and convenience of parties and witnesses favor a transfer.

■ In *Jumara v. State Farm Insurance Co.*, the Third Circuit outlined the private and public interests to be considered when determining "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum."[45] The private interests include: (1) "plaintiff's forum preference"; (2) defendant's forum preference; (3) "whether the claim arose elsewhere"; (4) "the convenience of the parties as indicated by their relative physical and financial condition"; (5) "the convenience of witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora"; and (6) "the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)."[46]

■ The public interests include: (1) "the enforceability of the judgment"; (2) "practical considerations that could make the trial easy, expeditious, or inexpensive";

(3) "the relative administrative difficulty in the two fora resulting from court congestion"; (4) "the local interest in deciding local controversies at home"; (5) "the public policies of the fora"; and (6) "the familiarity of the trial judge with the applicable state law in diversity cases."[47]

Gaps in the record prevent the Court from examining all of the factors,[48] and other factors are substantially neutral.[49] The Court is mindful that "the plaintiff's choice of venue should not be lightly disturbed."[50] Thus, Plaintiffs' preference to litigate in this Court, standing alone, easily outweighs Defendants' preference to litigate in the Northern District of Illinois. However, other factors strongly favor a transfer.

As outlined in the Court's discussion of the issue of personal jurisdiction, the majority of Plaintiffs' claims did not arise in this judicial district. Plaintiffs contend that the "primary claim" in their Complaint relates to "ownership of the invention."[51] Yet, Plaintiffs pursue their "primary claim" via the misappropriation and conversion causes of action, which for the reasons stated *supra* at part III.B.1., lay beyond the Court's jurisdiction because the operative facts occurred elsewhere. In

**44.** 28 U.S.C. § 1391(a)(1) (diversity action may be filed in "a judicial district where any defendant resides, if all defendants reside in the same State").

**45.** 55 F.3d 873, 879 (3d Cir.1995) (quoting 15 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3847 (2d ed.1986)).

**46.** *Id.*

**47.** *Id.* at 879–80.

**48.** For example, "court congestion" is measured by the amount of time from filing of a case to final disposition. *Whistler Group, Inc. v. PNI Corp.*, Civ. A. No. 3:03–CV–1536–G,

2003 WL 22939214, *4, 2003 U.S. Dist. LEXIS 21968, at *13 (N.D.Tex. Dec.5, 2003); *Wojtunik v. Kealy*, No. Civ.A.02–8410, 2003 WL 22006240, at *11 (E.D.Pa. Aug.26, 2003). There is no evidence before the Court comparing congestion in this district and the Northern District of Illinois.

**49.** The factors of convenience of parties and witnesses, enforceability of the judgment, the local interest in the controversy, the public policies of the fora, and the trial judge's familiarity with local law do not favor any one jurisdiction.

**50.** *Jumara*, 55 F.3d at 879 (citation omitted).

**51.** Pls.' Resp. at 8.

fact, this is the case for all but one of Plaintiffs' ten counts.

Additionally, practical considerations overwhelmingly favor transfer. Because of jurisdictional problems, the action cannot proceed as a whole in this Court. A transfer to the Northern District of Illinois, where the Chicago Action is currently pending, will permit resolution of this dispute in a single forum and, if the judge deems it appropriate, in a single consolidated action.[52] Finally, as Defendants note, the (cumbersome) inventions themselves are located in Illinois. To the extent the machines must be produced at trial, doing so in the Northern District of Illinois would be exceedingly easier and less expensive than doing so in this judicial district.

For these reasons, the motion to transfer is granted. An appropriate Order follows.

### ORDER

**AND NOW**, this 29th day of June, 2004, upon consideration of Defendants Su Heon Kim and By for the Cleaners, Inc.'s Motion to Dismiss [Docs. # 14–15], Plaintiffs' Response thereto [Doc. # 16] and Defendants' Reply [Doc. # 19], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**. It is specifically **ORDERED** that:

1. The above-captioned action is hereby **TRANSFERRED** to the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1404(a). The Clerk of Court is directed to **TRANSFER** the entire file to the Clerk of Court for the United States District Court for the Northern District of Illinois, Eastern Division. In doing so the Clerk shall inform the Northern District that this matter is related to a case pending in that district, *Kim v. Kim*, civil action number 04–1649 (filed Mar. 2, 2004).

2. Defendants' Motion is **DENIED** in all other respects;

3. The Clerk of Court is directed to close this case for administrative purposes.

It is so **ORDERED**.

---

**52.** *See Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 26, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."); *CIBC World Mkts., Inc. v. Deutsche Bank Sec., Inc.*, 309 F.Supp.2d 637, 651 (D.N.J.2004) ("Where, as here, related lawsuits are pending elsewhere, transfer-ring a case serves not only private interests but also the interests of justice because it eliminates the possibility of inconsistent results ... and conserves judicial resources."); *Martin v. PNC Fin. Servs. Group*, Civ. A. No. 02–CV–7191, 2003 WL 22097488, *1, 2003 U.S. Dist. LEXIS 9734, at * (E.D.Pa. May 22, 2003) ("[T]he presence of related cases in the transferee forum is a reason to grant a transfer.").